# COLUMBIA BROADCASTING SYSTEM, INC. *v.* DEMOCRATIC NATIONAL COMMITTEE

No. 71–863.   Argued October 16, 1972—Decided May 29, 1973*

---

*Together with Nos. 71–864, *Federal Communications Commission et al.* v. *Business Executives' Move for Vietnam Peace et al.;* 71–865, *Post-Newsweek Stations, Capital Area, Inc.* v. *Business Executives' Move for Vietnam Peace;* and 71–866, *American Broadcasting Cos., Inc.* v. *Democratic National Committee,* also on certiorari to the same court.

BURGER, C. J., announced the Court's judgment and delivered an opinion of the Court with respect to Parts I, II, and IV, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and in which as to Parts I, II, and III STEWART and REHNQUIST, JJ., joined. STEWART, J., filed an opinion concurring in Parts I, II, and III, *post,* p. 132. WHITE, J., filed an opinion concurring in Parts I, II, and IV, *post,* p. 146. BLACKMUN, J., filed an opinion concurring in Parts I, II, and IV, in which POWELL, J., joined, *post,* p. 147. DOUGLAS, J., filed an opinion concurring in the judgment, *post,* p. 148. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 170.

*J. Roger Wollenberg* argued the cause for petitioner in No. 71–863. With him on the briefs were *Lloyd N. Cutler, Timothy B. Dyk, Daniel Marcus, Robert V. Evans, John D. Appel,* and *Joseph DeFranco. Solicitor General Griswold* argued the cause for petitioners in No. 71–864. With him on the brief were *Acting Assistant Attorney General Comegys, Howard E. Shapiro,* and *John W. Pettit. Ernest W. Jennes* argued the cause for petitioner in No. 71–865. With him on the briefs were *Charles A. Miller* and *Michael Boudin. Vernon L. Wilkinson* argued the cause for petitioner in No. 71–866. With him on the brief were *James A. McKenna, Jr.,* and *Carl R. Ramey.*

*Joseph A. Califano, Jr.,* argued the cause for respondent Democratic National Committee in Nos. 71–863, 71–864, and 71–866. With him on the brief was *John G. Kester. Thomas R. Asher* argued the cause for respondent Busi-

ness Executives' Move for Vietnam Peace in Nos. 71–864 and 71–865. With him on the brief was *Albert H. Kramer.*†

Mr. Chief Justice Burger delivered the opinion of the Court (Parts I, II, and IV) together with an opinion (Part III), in which Mr. Justice Stewart and Mr. Justice Rehnquist joined.

We granted the writs of certiorari in these cases to consider whether a broadcast licensee's general·policy of not selling advertising time to individuals or groups wishing to speak out on issues they consider important violates the Federal Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.,* or the First Amendment.

In two orders announced the same day, the Federal Communications Commission ruled that a broadcaster who meets his public obligation to provide full and fair coverage of public issues is not required to accept editorial advertisements. *Democratic National Committee,* 25 F. C. C. 2d 216; *Business Executives' Move for Vietnam Peace,* 25 F. C. C. 2d 242. A divided Court of Appeals reversed the Commission, holding that a broadcaster's fixed policy of refusing editorial advertisements violates the First Amendment; the court remanded the cases to the Commission to develop procedures and guidelines for administering a First Amendment right of access. *Business Executives' Move For Vietnam Peace v. FCC,* 146 U. S. App. D. C. 181, 450 F. 2d 642 (1971).

The complainants in these actions are the Democratic

†*Floyd Abrams* and *Corydon B. Dunham* filed a brief for National Broadcasting Co., Inc., as *amicus curiae* urging reversal.

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

National Committee (DNC) and the Business Executives' Move for Vietnam Peace (BEM), a national organization of businessmen opposed to United States involvement in the Vietnam conflict. In January 1970, BEM filed a complaint with the Commission charging that radio station WTOP in Washington, D. C., had refused to sell it time to broadcast a series of one-minute spot announcements expressing BEM views on Vietnam. WTOP, in common with many, but not all, broadcasters, followed a policy of refusing to sell time for spot announcements to individuals and groups who wished to expound their views on controversial issues. WTOP took the position that since it presented full and fair coverage of important public questions, including the Vietnam conflict, it was justified in refusing to accept editorial advertisements. WTOP also submitted evidence showing that the station had aired the views of critics of our Vietnam policy on numerous occasions. BEM challenged the fairness of WTOP's coverage of criticism of that policy, but it presented no evidence in support of that claim.

Four months later, in May 1970, DNC filed with the Commission a request for a declaratory ruling:

> "That under the First Amendment to the Constitution and the Communications Act, a broadcaster may not, as a general policy, refuse to sell time to responsible entities, such as the DNC, for the solicitation of funds and for comment on public issues."

DNC claimed that it intended to purchase time from radio and television stations and from the national networks in order to present the views of the Democratic Party and to solicit funds. Unlike BEM, DNC did not object to the policies of any particular broadcaster but claimed that its prior "experiences in this area make it

clear that it will encounter considerable difficulty—if not total frustration of its efforts—in carrying out its plans in the event the Commission should decline to issue a ruling as requested." DNC cited *Red Lion Broadcasting Co. v. FCC,* 395 U. S. 367 (1969), as establishing a limited constitutional right of access to the airwaves.

In two separate opinions, the Commission rejected respondents' claims that "responsible" individuals and groups have a right to purchase advertising time to comment on public issues without regard to whether the broadcaster has complied with the Fairness Doctrine. The Commission viewed the issue as one of major significance in administering the regulatory scheme relating to the electronic media, one going "to the heart of the system of broadcasting which has developed in this country . . . ." 25 F. C. C. 2d, at 221. After reviewing the legislative history of the Communications Act, the provisions of the Act itself, the Commission's decisions under the Act, and the difficult problems inherent in administering a right of access, the Commission rejected the demands of BEM and DNC.

The Commission also rejected BEM's claim that WTOP had violated the Fairness Doctrine by failing to air views such as those held by members of BEM; the Commission pointed out that BEM had made only a "general allegation" of unfairness in WTOP's coverage of the Vietnam conflict and that the station had adequately rebutted the charge by affidavit. The Commission did, however, uphold DNC's position that the statute recognized a right of political parties to purchase broadcast time for the purpose of soliciting funds. The Commission noted that Congress has accorded special consideration for access by political parties, see 47 U. S. C. § 315 (a), and that solicitation of funds by political parties is both

feasible and appropriate in the short space of time generally allotted to spot advertisements.[1]

A majority of the Court of Appeals reversed the Commission, holding that "a flat ban on paid public issue announcements is in violation of the First Amendment, at least when other sorts of paid announcements are accepted." 146 U. S. App. D. C., at 185, 450 F. 2d, at 646. Recognizing that the broadcast frequencies are a scarce resource inherently unavailable to all, the court nevertheless concluded that the First Amendment mandated an "abridgeable" right to present editorial advertisements. The court reasoned that a broadcaster's policy of airing commercial advertisements but not editorial advertisements constitutes unconstitutional discrimination. The court did not, however, order that either BEM's or DNC's proposed announcements must be accepted by the broadcasters; rather, it remanded the cases to the Commission to develop "reasonable procedures and regulations determining which and how many 'editorial advertisements' will be put on the air." *Ibid.*

Judge McGowan dissented; in his view, the First Amendment did not compel the Commission to undertake the task assigned to it by the majority:

> "It is presently the obligation of a licensee to advance the public's right to know by devoting a substantial amount of time to the presentation of controversial views on issues of public importance, striking a balance which is always subject to redress by reference to the fairness doctrine. Failure to do so puts continuation of the license at risk—a sanction of tremendous potency, and one which the Commission is under increasing pressure to employ.

---

[1] The Commission's rulings against BEM's Fairness Doctrine complaint and in favor of DNC's claim that political parties should be permitted to purchase air time for solicitation of funds were not appealed to the Court of Appeals and are not before us here.

"This is the system which Congress has, wisely or not, provided as the alternative to public ownership and operation of radio and television communications facilities. This approach has never been thought to be other than within the permissible limits of constitutional choice." 146 U. S. App. D. C., at 205, 450 F. 2d, at 666.

Judge McGowan concluded that the court's decision to overrule the Commission and to remand for development and implementation of a constitutional right of access put the Commission in a "constitutional straitjacket" on a highly complex and far-reaching issue.

I

MR. JUSTICE WHITE's opinion for the Court in *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969), makes clear that the broadcast media pose unique and special problems not present in the traditional free speech case. Unlike other media, broadcasting is subject to an inherent physical limitation. Broadcast frequencies are a scarce resource; they must be portioned out among applicants. All who possess the financial resources and the desire to communicate by television or radio cannot be satisfactorily accommodated. The Court spoke to this reality when, in *Red Lion,* we said "it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Id.,* at 388.

Because the broadcast media utilize a valuable and limited public resource, there is also present an unusual order of First Amendment values. *Red Lion* discussed at length the application of the First Amendment to the broadcast media. In analyzing the broadcasters' claim that the Fairness Doctrine and two of its component rules violated their freedom of expression, we

held that "[n]o one has a First Amendment right to a license or to monopolize a radio frequency; to deny a station license because 'the public interest' requires it 'is not a denial of free speech.' " *Id.*, at 389. Although the broadcaster is not without protection under the First Amendment, *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 166 (1948), "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount. . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC." *Red Lion, supra,* at 390.

Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of a great delicacy and difficulty. The process must necessarily be undertaken within the framework of the regulatory scheme that has evolved over the course of the past half century. For, during that time, Congress and its chosen regulatory agency have established a delicately balanced system of regulation intended to serve the interests of all concerned. The problems of regulation are rendered more difficult because the broadcast industry is dynamic in terms of technological change; solutions adequate a decade ago are not necessarily so now, and those acceptable today may well be outmoded 10 years hence.

Thus, in evaluating the First Amendment claims of respondents, we must afford great weight to the decisions of Congress and the experience of the Commission. Professor Chafee aptly observed:

"Once we get away from the bare words of the [First] Amendment, we must construe it as part of a Constitution which creates a government for the purpose of performing several very important tasks.

The [First] Amendment should be interpreted so as not to cripple the regular work of the government. A part of this work is the regulation of interstate and foreign commerce, and this has come in our modern age to include the job of parceling out the air among broadcasters, which Congress has entrusted to the FCC. Therefore, every free-speech problem in the radio has to be considered with reference to the satisfactory performance of this job as well as to the value of open discussion. Although free speech should weigh heavily in the scale in the event of conflict, still the Commission should be given ample scope to do its job." 2 Z. Chafee, Government and Mass Communications 640–641 (1947).

The judgment of the Legislative Branch cannot be ignored or undervalued simply because one segment of the broadcast constituency casts its claims under the umbrella of the First Amendment. That is not to say we "defer" to the judgment of the Congress and the Commission on a constitutional question, or that we would hesitate to invoke the Constitution should we determine that the Commission has not fulfilled its task with appropriate sensitivity to the interests in free expression. The point is, rather, that when we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem. Thus, before confronting the specific legal issues in these cases, we turn to an examination of the legislative and administrative development of our broadcast system over the last half century.

## II

This Court has on numerous occasions recounted the origins of our modern system of broadcast regulation. See, e. g., Red Lion, supra, at 375–386; National Broad-

*casting Co.* v. *United States,* 319 U. S. 190, 210–217 (1943); *FCC* v. *Sanders Brothers Radio Station,* 309 U. S. 470, 474 (1940); *FCC* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 137–138 (1940). We have noted that prior to the passage of the Radio Act of 1927, 44 Stat. 1162, broadcasting was marked by chaos. The unregulated and burgeoning private use of the new media in the 1920's had resulted in an intolerable situation demanding congressional action:

> "It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard." *Red Lion, supra,* at 376.

But, once it was accepted that broadcasting was subject to regulation, Congress was confronted with a major dilemma: how to strike a proper balance between private and public control. Cf. *Farmers Union* v. *WDAY,* 360 U. S. 525, 528 (1959).

One of the earliest and most frequently quoted statements of this dilemma is that of Herbert Hoover, when he was Secretary of Commerce. While his Department was making exploratory attempts to deal with the infant broadcasting industry in the early 1920's, he testified before a House Committee:

> "We can not allow any single person or group to place themselves in [a] position where they can censor the material which shall be broadcasted to the public, nor do I believe that the Government should ever be placed in the position of censoring this material." Hearings on H. R. 7357 before the House Committee on the Merchant Marine and Fisheries, 68th Cong., 1st Sess., 8 (1924).

That statement foreshadowed the "tightrope" aspects of Government regulation of the broadcast media, a problem the Congress, the Commission, and the courts have struggled with ever since. Congress appears to have concluded, however, that of these two choices—private or official censorship—Government censorship would be the most pervasive, the most self-serving, the most difficult to restrain and hence the one most to be avoided.

The legislative history of the Radio Act of 1927, the model for our present statutory scheme, see *FCC v. Pottsville Broadcasting Co., supra,* at 137, reveals that in the area of discussion of public issues Congress chose to leave broad journalistic discretion with the licensee. Congress specifically dealt with—and firmly rejected—the argument that the broadcast facilities should be open on a nonselective basis to all persons wishing to talk about public issues. Some members of Congress—those whose views were ultimately rejected— strenuously objected to the unregulated power of broadcasters to reject applications for service. See, *e. g.,* H. R. Rep. No. 404, 69th Cong., 1st Sess., 18 (minority report). They regarded the exercise of such power to be "private censorship," which should be controlled by treating broadcasters as public utilities.[2] The provision that came closest to imposing an unlimited right of access to broadcast time was part of the bill reported to the Senate by the Committee on Interstate Commerce. The

---

[2] Congressman Davis, for example, stated on the floor of the House the view that Congress found unacceptable:

"I do not think any member of the committee will deny that it is absolutely inevitable that we are going to have to regulate the radio public utilities just as we regulate other public utilities. We are going to have to regulate the rates and the service, and to force them to give equal service and equal treatment to all." 67 Cong. Rec. 5483 (1926). See also *id.,* at 5484.

bill that emerged from the Committee contained the following provision:

"[I]f any licensee shall permit a broadcasting station to be used . . . by a candidate or candidates for any public office, *or for the discussion of any question affecting the public,* he shall make no discrimination as to the use of such broadcasting station, *and with respect to said matters the licensee shall be deemed a common carrier in interstate commerce:* Provided, that such licensee shall have no power to censor the material broadcast." 67 Cong. Rec. 12503 (1926) (emphasis added).

When the bill came to the Senate floor, the principal architect of the Radio Act of 1927, Senator Dill, offered an amendment to the provision to eliminate the common carrier obligation and to restrict the right of access to candidates for public office. Senator Dill explained the need for the amendment:

"When we recall that broadcasting today is purely voluntary, and the listener-in pays nothing for it, that the broadcaster gives it for the purpose of building up his reputation, it seemed unwise to put the broadcaster under the hampering control of being a common carrier and compelled to accept anything and everything that was offered him so long as the price was paid." 67 Cong. Rec. 12502.

The Senators were also sensitive to the problems involved in legislating "equal opportunities" with respect to the discussion of public issues. Senator Dill stated:

"['Public questions'] is such a general term that there is probably no question of any interest whatsoever that could be discussed but that the other side of it could demand time; and thus a radio station

would be placed in the position that the Senator from Iowa mentions about candidates, namely, that they would have to give all their time to that kind of discussion, or no public question could be discussed." *Id.*, at 12504.

The Senate adopted Senator Dill's amendment. The provision finally enacted, § 18 of the Radio Act of 1927, 44 Stat. 1170, was later re-enacted as § 315 (a) of the Communications Act of 1934,[3] but only after Congress rejected another proposal that would have imposed a limited obligation on broadcasters to turn over their microphones to persons wishing to speak out on certain

---

[3] Section 315 (a) now reads:

"If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

"(1) bona fide newscast,

"(2) bona fide news interview,

"(3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

"(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

"shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 47 U. S. C. § 315 (a).

public issues.[4] Instead, Congress after prolonged consideration adopted § 3 (h), which specifically provides that "a person engaged in radio broadcasting shall not,

[4] The Senate passed a provision stating that:

"[I]f any licensee shall permit any person to use a broadcasting station in support of or in opposition to any candidate for public office, *or in the presentation of views on a public question to be voted upon at an election, he shall afford equal opportunity to an equal number of other persons to use such station* in support of an opposing candidate for such public office, or to reply to a person who has used such broadcasting station in support of or in opposition to a candidate, *or for the presentation of opposite views on such public questions."*

See Hearings on S. 2910 before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess., 19 (1934) (emphasis added). ·The provision for discussion of public issues was deleted by the House-Senate Conference. See H. R. Conf. Rep. No. 1918 on S. 3285, 73d Cong., 2d Sess., 49.

Also noteworthy are two bills offered in 1934 that would have restricted the control of broadcasters over the discussion of certain issues. Congressman McFadden proposed a bill that would have forbidden broadcasters to discriminate against programs sponsored by religious, charitable, or educational associations. H. R. 7986, 73d Cong., 2d Sess. The bill was not reported out of committee. And, during the debates on the 1934 Act, Senators Wagner and Hatfield offered an amendment that would have ordered the Commission to "reserve and allocate only to educational, religious, agricultural, labor, cooperative, and similar non-profit-making associations one-fourth of all the radio broadcasting facilities within its jurisdiction." 78 Cong. Rec. 8828. Senator Dill explained why the Committee had rejected the proposed amendment, indicating that the practical difficulties and the dangers of censorship were crucial:

"MR. DILL. . . . If we should provide that 25 percent of time shall be allocated to nonprofit organizations, someone would have to determine—Congress or somebody else—how much of .the 25 percent should go to education, how much of it to religion, and how much of it to agriculture, how much of it to labor, how much of it to fraternal organizations, and so forth. When we enter this

insofar as such person is so engaged, be deemed a common carrier." [5]

Other provisions of the 1934 Act also evince a legislative desire to preserve values of private journalism under a regulatory scheme which would insure fulfillment of certain public obligations. Although the Commission was given the authority to issue renewable three-year licenses to broadcasters [6] and to promulgate rules and regulations governing the use of those licenses, [7] both con-

_____

field we must determine how much to give to the Catholics probably and how much to the Protestants and how much to the Jews." 78 Cong. Rec. 8843.

Senator Dill went on to say that the problem of determining the proper allocation of time for discussion of these subjects should be worked out by the Commission. *Id.*, at 8844. The Senate rejected the amendment. *Id.*, at 8846.

[5] Section 3 (h) provides as follows:

" 'Common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier." 48 Stat. 1066, as amended, 47 U. S. C. § 153 (h).

[6] 48 Stat. 1083, as amended, 47 U. S. C. § 307.

[7] Section 303, 48 Stat. 1082, as amended, 47 U. S. C. § 303, provides in relevant part:

"Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

.        .        .        .        .

"(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

.        .        .        .        .

"(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter . . . ."

sistent with the "public convenience, interest, or necessity," § 326 of the Act specifically provides that:

"Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication." 47 U. S. C. § 326.

From these provisions it seems clear that Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations. Only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters will government power be asserted within the framework of the Act. License renewal proceedings, in which the listening public can be heard, are a principal means of such regulation. See *Office of Communication of United Church of Christ* v. *FCC*, 123 U. S. App. D. C. 328, 359 F. 2d 994 (1966), and 138 U. S. App. D. C. 112, 425 F. 2d 543 (1969).

Subsequent developments in broadcast regulation illustrate how this regulatory scheme has evolved. Of particular importance, in light of Congress' flat refusal to impose a "common carrier" right of access for all persons wishing to speak out on public issues, is the Commission's "Fairness Doctrine," which evolved gradually over the years spanning federal regulation of the broadcast media.[8] Formulated under the Commission's power to

---

[8] In 1959, Congress amended § 315 of the Act to give statutory approval to the Fairness Doctrine. Act of Sept. 14, 1959, § 1, 73 Stat. 557, 47 U. S. C. § 315 (a).

For a summary of the development and nature of the Fairness Doctrine, see *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 375–386 (1969).

issue regulations consistent with the "public interest," the doctrine imposes two affirmative responsibilities on the broadcaster: coverage of issues of public importance must be adequate and must fairly reflect differing viewpoints. See *Red Lion,* 395 U. S., at 377. In fulfilling the Fairness Doctrine obligations, the broadcaster must provide free time for the presentation of opposing views if a paid sponsor is unavailable, *Cullman Broadcasting Co.,* 25 P & F Radio Reg. 895 (1963), and must initiate programming on public issues if no one else seeks to do so. See *John J. Dempsey,* 6 P & F Radio Reg. 615 (1950); *Red Lion, supra,* at 378.

Since it is physically impossible to provide time for all viewpoints, however, the right to exercise editorial judgment was granted to the broadcaster. The broadcaster, therefore, is allowed significant journalistic discretion in deciding how best to fulfill the Fairness Doctrine obligations,[9] although that discretion is bounded by rules designed to assure that the public interest in fairness is furthered. In its decision in the instant cases, the Commission described the boundaries as follows:

> "The most basic consideration in this respect is that the licensee cannot rule off the air coverage of important issues or views because of his private ends or beliefs. As a public trustee, he must present

---

[9] See *Madalyn Murray,* 5 P & F Radio Reg. 2d 263 (1965). Factors that the broadcaster must take into account in exercising his discretion include the following:

"In determining whether to honor specific requests for time, the station will inevitably be confronted with such questions as whether the subject is worth considering, whether the viewpoint of the requesting party has already received a sufficient amount of broadcast time, or whether there may not be other available groups or individuals who might be more appropriate spokesmen for the particular point of view than the person [or group] making the request." Report on Editorializing by Broadcast Licensees, 13 F. C. C. 1246, 1251–1252 (1949).

representative community views and voices on controversial issues which are of importance to his listeners. . . . This means also that some of the voices must be partisan. A licensee policy of excluding partisan voices and always itself presenting views in a bland, inoffensive manner would run counter to the 'profound national commitment that debate on public issues should be uninhibited, robust, and wide-open.' *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964); see also *Red Lion Broadcasting Co., Inc.* v. *F. C. C.,* 395 U. S. 367, 392 (n. 18) (1969) . . . ." 25 F. C. C. 2d, at 222–223.

Thus, under the Fairness Doctrine broadcasters are responsible for providing the listening and viewing public with access to a balanced presentation of information on issues of public importance.[10] The basic principle underlying that responsibility is "the right of the public to be informed, rather than any right on the part of the

---

[10] The Commission has also adopted various component regulations under the Fairness Doctrine, the most notable of which are the "personal attack" and "political editorializing" rules which we upheld in *Red Lion.* The "personal attack" rule provides that "[w]hen, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person," the licensee must notify the person attacked and give him an opportunity to respond. *E. g.,* 47 CFR § 73.123. Similarly, the "political editorializing" rule provides that, when a licensee endorses a political candidate in an editorial, he must give other candidates or their spokesmen an opportunity to respond. *E. g., id.,* § 73.123.

The Commission, of course, has taken other steps beyond the Fairness Doctrine to expand the diversity of expression on radio and television. The chain broadcasting and multiple ownership rules are established examples. *E. g., id.,* §§ 73.131, 73.240. More recently, the Commission promulgated rules limiting television network syndication practices and reserving 25% of prime time for non-network programs. *Id.,* §§ 73.658 (j), (k).

Government, any broadcast licensee or any individual member of the public to broadcast his own particular views on any matter . . . ." Report on Editorializing by Broadcast Licensees, 13 F. C. C. 1246, 1249 (1949). Consistent with that philosophy, the Commission on several occasions has ruled that no private individual or group has a right to command the use of broadcast facilities.[11] See, *e. g., Dowie A. Crittenden,* 18 F. C. C. 2d 499 (1969); *Margaret Z. Scherbina,* 21 F. C. C. 2d 141 (1969); *Boalt Hall Student Assn.,* 20 F. C. C. 2d 612 (1969); *Madalyn Murray,* 40 F. C. C. 647 (1965); *Democratic State Central Committee of California,* 19 F. C. C. 2d 833 (1968); *U. S. Broadcasting Corp.,* 2 F. C. C. 208 (1935). Congress has not yet seen fit to alter that policy, although since 1934 it has amended the Act on several occasions [12] and considered various

---

[11] The Court of Appeals, respondents, and the dissent in this case have relied on dictum in *United Broadcasting Co.,* 10 F. C. C. 515 (1945), as illustrating Commission approval of a private right to purchase air time for the discussion of controversial issues. In that case the complaint alleged, not only that the station had a policy of refusing to sell time for the discussion of public issues, but also that the station had applied its policy in a discriminatory manner, a factor not shown in the cases presently before us. Furthermore, the decision was handed down four years before the Commission had fully developed and articulated the Fairness Doctrine. See Report on Editorializing by Broadcast Licensees, 13 F. C. C. 1246 (1949). Thus, even if the decision is read without reference to the allegation of discrimination, it stands as merely an isolated statement, made during the period in which the Commission was still working out the problems associated with the discussion of public issues; the dictum has not been followed since and has been modified by the Fairness Doctrine.

[12] In 1959, as noted earlier, Congress amended § 315 (a) of the Act to give statutory approval to the Commission's Fairness Doctrine. Act of Sept. 14, 1959, § 1, 73 Stat. 557, 47 U. S. C. § 315 (a). Very recently, Congress amended § 312 (a) of the 1934 Act to authorize the Commission to revoke a station license "for willful

proposals that would have vested private individuals with a right of access.[13]

With this background in mind, we next proceed to consider whether a broadcaster's refusal to accept editorial advertisements is governmental action violative of the First Amendment.

## III

That "Congress shall make no law . . . abridging the freedom of speech, or of the press" is a restraint on government action, not that of private persons. *Public Utilities Comm'n* v. *Pollak*, 343 U. S. 451, 461 (1952). The Court has not previously considered whether the action of a broadcast licensee such as that challenged here is "governmental action" for purposes of the First

---

or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy." Campaign Communications Reform Act of 1972, Pub. L. 92–225, 86 Stat. 4. This amendment essentially codified the Commission's prior interpretation of § 315 (a) as requiring broadcasters to make time available to political candidates. *Farmers Union* v. *WDAY*, 360 U. S. 525, 534 (1959). See FCC Memorandum on Second Sentence of Section 315 (a), in Political Broadcasts—Equal Time, Hearings before Subcommittee of the House Committee on Interstate and Foreign Commerce, 88th Cong., 1st Sess., on H. J. Res. 247, pp. 84–90.

[13] See, *e. g.*, H. R. 3595, 80th Cong., 1st Sess. (1947). A more recent proposal was offered by Senator Fulbright. His bill would have amended § 315 of the Act to provide:

"(d) Licensees shall provide a reasonable amount of public service time to authorized representatives of the Senate of the United States, and the House of Representatives of the United States, to present the views of the Senate and the House of Representatives on issues of public importance. The public service time required to be provided under this subsection shall be made available to each such authorized representative at least, but not limited to, four times during each calendar year." S. J. Res. 209, 91st Cong., 2d Sess. (1970).

Amendment. The holding under review thus presents a novel question, and one with far-reaching implications. See Jaffe, The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access, 85 Harv. L. Rev. 768, 782–787 (1972).

The Court of Appeals held that broadcasters are instrumentalities of the Government for First Amendment purposes, relying on the thesis, familiar in other contexts, that broadcast licensees are granted use of part of the public domain and are regulated as "proxies" or " 'fiduciaries' of the people." 146 U. S. App. D. C., at 191, 450 F. 2d, at 652. These characterizations are not without validity for some purposes, but they do not resolve the sensitive constitutional issues inherent in deciding whether a particular licensee action is subject to First Amendment restraints.[14]

In dealing with the broadcast media, as in other contexts, the line between private conduct and governmental action cannot be defined by reference to any general formula unrelated to particular exercises of governmental authority. When governmental action is alleged there must be cautious analysis of the quality and degree of Government relationship to the particular acts in question. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 722 (1961).

---

[14] The dissent offers the same analysis as the Court of Appeals. As one distinguished commentator has recognized, this line of reasoning "stretch[es] the concept of state action very far." Jaffe, The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access, 85 Harv. L. Rev. 768, 784 (1972). The notion that broadcasters are engaged in "governmental action" because they are licensed to utilize the "public" frequencies and because they are regulated is superficially appealing but, as Professor Jaffe observes, "not entirely satisfactory." *Id.,* at 783.

In deciding whether the First Amendment encompasses the conduct challenged here, it must be kept in mind that we are dealing with a vital part of our system of communication. The electronic media have swiftly become a major factor in the dissemination of ideas and information. More than 7,000 licensed broadcast stations undertake to perform this important function. To a large extent they share with the printed media the role of keeping people informed.

As we have seen, with the advent of radio a half century ago, Congress was faced with a fundamental choice between total Government ownership and control of the new medium—the choice of most other countries—or some other alternative. Long before the impact and potential of the medium was realized, Congress opted for a system of private broadcasters licensed and regulated by Government. The legislative history suggests that this choice was influenced not only by traditional attitudes toward private enterprise, but by a desire to maintain for licensees, so far as consistent with necessary regulation, a traditional journalistic role. The historic aversion to censorship led Congress to enact § 326 of the Act, which explicitly prohibits the Commission from interfering with the exercise of free speech over the broadcast frequencies. Congress pointedly refrained from divesting broadcasters of their control over the selection of voices; § 3 (h) of the Act stands as a firm congressional statement that broadcast licensees are not to be treated as common carriers, obliged to accept whatever is tendered by members of the public. Both these provisions clearly manifest the intention of Congress to maintain a substantial measure of journalistic independence for the broadcast licensee.[15]

---

[15] The dissenting view would appear to "want to have it both ways" on the question of Government control of the broadcast media. In finding governmental action, the dissent stresses what is per-

The regulatory scheme evolved slowly, but very early the licensee's role developed in terms of a "public trustee" charged with the duty of fairly and impartially informing the public audience. In this structure the Commission acts in essence as an "overseer," but the initial and primary responsibility for fairness, balance, and objectivity rests with the licensee. This role of the Government as an "overseer" and ultimate arbiter and guardian of the public interest and the role of the licensee as a journalistic "free agent" call for a delicate balancing of competing interests. The maintenance of this balance for more than 40 years has called on both the regulators and the licensees to walk a "tightrope" to preserve the First Amendment values written into the Radio Act and its successor, the Communications Act.

The tensions inherent in such a regulatory structure emerge more clearly when we compare a private newspaper with a broadcast licensee. The power of a privately owned newspaper to advance its own political, social, and economic views is bounded by only two factors: first, the acceptance of a sufficient number of readers—and hence advertisers—to assure financial success; and, second, the journalistic integrity of its editors and publishers. A broadcast licensee has a large measure of journalistic freedom but not as large as that exercised by

ceived as an "elaborate statutory scheme governing virtually all aspects of the broadcast industry." "Indeed," the dissent suggests, "federal agency review and guidance of broadcaster conduct is automatic, continuing, and pervasive." *Post*, at 176–177. Yet later in the dissent, when discussing the constitutional need for a right of access, the dissent objects to the substantial independence afforded broadcasters in covering issues of public importance. Thus, it is said that "broadcasters retain almost exclusive control over the selection of issues and viewpoints to be covered, the manner of presentation and, perhaps most important, who shall speak." *Post*, at 187.

a newspaper. A licensee must balance what it might prefer to do as a private entrepreneur with what it is required to do as a "public trustee." To perform its statutory duties, the Commission must oversee without censoring. This suggests something of the difficulty and delicacy of administering the Communications Act—a function calling for flexibility and the capacity to adjust and readjust the regulatory mechanism to meet changing problems and needs.

The licensee policy challenged in this case is intimately related to the journalistic role of a licensee for which it has been given initial and primary responsibility by Congress. The licensee's policy against accepting editorial advertising cannot be examined as an abstract proposition, but must be viewed in the context of its journalistic role. It does not help to press on us the idea that editorial ads are "like" commercial ads, for the licensee's policy against editorial spot ads is expressly based on a journalistic judgment that 10- to 60-second spot announcements are ill-suited to intelligible and intelligent treatment of public issues; the broadcaster has chosen to provide a balanced treatment of controversial questions in a more comprehensive form. Obviously the licensee's evaluation is based on its own journalistic judgment of priorities and newsworthiness.

Moreover, the Commission has not fostered the licensee policy challenged here; it has simply declined to command particular action because it fell within the area of journalistic discretion. The Commission explicitly emphasized that "there is of course no Commission policy thwarting the sale of time to comment on public issues." 25 F. C. C. 2d, at 226. The Commission's reasoning, consistent with nearly 40 years of precedent, is that so long as a licensee meets its "public trustee" obligation to provide balanced coverage of issues and events, it has broad discretion to decide how that obligation will be

met. We do not reach the question whether the First Amendment or the Act can be read to preclude the Commission from determining that in some situations the public interest requires licensees to re-examine their policies with respect to editorial advertisements. The Commission has not yet made such a determination; it has, for the present at least, found the policy to be within the sphere of journalistic discretion which Congress has left with the licensee.

Thus, it cannot be said that the Government is a "partner" to the action of the broadcast licensee complained of here, nor is it engaged in a "symbiotic relationship" with the licensee, profiting from the invidious discrimination of its proxy. Compare *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 174–177 (1972), with *Burton* v. *Wilmington Parking Authority*, 365 U. S., at 723–724. The First Amendment does not reach acts of private parties in every instance where the Congress or the Commission has merely permitted or failed to prohibit such acts.

Our conclusion is not altered merely because the Commission rejected the claims of BEM and DNC and concluded that the challenged licensee policy is not inconsistent with the public interest. It is true that in *Public Utilities Comm'n* v. *Pollak*, 343 U. S. 451 (1952), we found governmental action sufficient to trigger First Amendment protections on a record involving agency approval of the conduct of a public utility. Though we held that the decision of a District of Columbia bus company to install radio receivers in its public buses was within the reach of the First Amendment, there Congress had expressly authorized the agency to undertake plenary intervention into the affairs of the carrier and it was pursuant to that authorization that the agency investigated the challenged policy and approved it on public interest standards. *Id.*, at 462.

Here, Congress has not established a regulatory scheme for broadcast licensees as pervasive as the regulation of public transportation in *Pollak*. More important, as we have noted, Congress has affirmatively indicated in the Communications Act that certain journalistic decisions are for the licensee, subject only to the restrictions imposed by evaluation of its overall performance under the public interest standard. In *Pollak* there was no suggestion that Congress had considered worthy of protection the carrier's interest in exercising discretion over the content of communications forced on passengers. A more basic distinction, perhaps, between *Pollak* and this case is that *Pollak* was concerned with a transportation utility that itself derives no protection from the First Amendment. See *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 166 (1948).

Were we to read the First Amendment to spell out governmental action in the circumstances presented here, few licensee decisions on the content of broadcasts or the processes of editorial evaluation would escape constitutional scrutiny. In this sensitive area so sweeping a concept of governmental action would go far in practical effect to undermine nearly a half century of unmistakable congressional purpose to maintain—no matter how difficult the task—essentially private broadcast journalism held only broadly accountable to public interest standards. To do this Congress, and the Commission as its agent, must remain in a posture of flexibility to chart a workable "middle course" in its quest to preserve a balance between the essential public accountability and the desired private control of the media.

More profoundly, it would be anomalous for us to hold, in the name of promoting the constitutional guarantees of free expression, that the day-to-day editorial decisions of broadcast licensees are subject to the kind of restraints urged by respondents. To do so in the name

of the First Amendment would be a contradiction. Journalistic discretion would in many ways be lost to the rigid limitations that the First Amendment imposes on Government. Application of such standards to broadcast licensees would be antithetical to the very ideal of vigorous, challenging debate on issues of public interest. Every licensee is already held accountable for the totality of its performance of public interest obligations.

The concept of private, independent broadcast journalism, regulated by Government to assure protection of the public interest, has evolved slowly and cautiously over more than 40 years and has been nurtured by processes of adjudication. That concept of journalistic independence could not co-exist with a reading of the challenged conduct of the licensee as governmental action. Nor could it exist without administrative flexibility to meet changing needs and swift technological developments. We therefore conclude that the policies complained of do not constitute governmental action violative of the First Amendment. See *McIntire* v. *William Penn Broadcasting Co.*, 151 F. 2d 597, 601 (CA3 1945), cert. denied, 327 U. S. 779 (1946); *Massachusetts Universalist Convention* v. *Hildreth & Rogers Co.*, 183 F. 2d 497 (CA1 1950); *Post* v. *Payton*, 323 F. Supp. 799, 803 (EDNY 1971).

## IV

There remains for consideration the question whether the "public interest" standard of the Communications Act requires broadcasters to accept editorial advertisements or, whether, assuming governmental action, broadcasters are required to do so by reason of the First Amendment. In resolving those issues, we are guided by the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." *Red Lion*, 395 U. S., at 381. Whether

there are "compelling indications" of error in these cases must be answered by a careful evaluation of the Commission's reasoning in light of the policies embodied by Congress in the "public interest" standard of the Act. Many of those policies, as the legislative history makes clear, were drawn from the First Amendment itself; the "public interest" standard necessarily invites reference to First Amendment principles. Thus, the question before us is whether the various interests in free expression of the public, the broadcaster, and the individuals require broadcasters to sell commercial time to persons wishing to discuss controversial issues. In resolving that issue it must constantly be kept in mind that the interest of the public is our foremost concern. With broadcasting, where the available means of communication are limited in both space and time, the admonition of Professor Alexander Meiklejohn that "[w]hat is essential is not that everyone shall speak, but that everything worth saying shall be said" is peculiarly appropriate. Political Freedom 26 (1948).

At the outset we reiterate what was made clear earlier that nothing in the language of the Communications Act or its legislative history compels a conclusion different from that reached by the Commission. As we have seen, Congress has time and again rejected various legislative attempts that would have mandated a variety of forms of individual access. That is not to say that Congress' rejection of such proposals must be taken to mean that Congress is opposed to private rights of access under all circumstances. Rather, the point is that Congress has chosen to leave such questions with the Commission, to which it has given the flexibility to experiment with new ideas as changing conditions require. In this case, the Commission has decided that on balance the undesirable effects of the right of access urged by respondents would outweigh the asserted benefits. The Court of

Appeals failed to give due weight to the Commission's judgment on these matters.

The Commission was justified in concluding that the public interest in providing access to the marketplace of "ideas and experiences" would scarcely be served by a system so heavily weighted in favor of the financially affluent, or those with access to wealth. Cf. *Red Lion, supra,* at 392. Even under a first-come-first-served system, proposed by the dissenting Commissioner in these cases,[16] the views of the affluent could well prevail over those of others, since they would have it within their power to purchase time more frequently. Moreover, there is the substantial danger, as the Court of Appeals acknowledged, 146 U. S. App. D. C., at 203, 450 F. 2d, at 664, that the time allotted for editorial advertising could be monopolized by those of one political persuasion.

These problems would not necessarily be solved by applying the Fairness Doctrine, including the *Cullman* doctrine, to editorial advertising. If broadcasters were required to provide time, free when necessary, for the discussion of the various shades of opinion on the issue discussed in the advertisement, the affluent could still determine in large part the issues to be discussed. Thus, the very premise of the Court of Appeals' holding—that a right of access is necessary to allow individuals and groups the opportunity for self-initiated speech—would have little meaning to those who could not afford to purchase time in the first instance.[17]

---

[16] See 25 F. C. C. 2d 216, 230, 234–235 (Johnson, dissenting).

[17] To overcome this inconsistency it has been suggested that a "submarket rate system" be established for those unable to afford the normal cost for air time. See Note, 85 Harv. L. Rev. 689, 695–696 (1972). That proposal has been criticized, we think justifiably, as raising "incredible administrative problems." Jaffe, The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access, 85 Harv. L. Rev. 768, 789 (1972).

If the Fairness Doctrine were applied to editorial advertising, there is also the substantial danger that the effective operation of that doctrine would be jeopardized. To minimize financial hardship and to comply fully with its public responsibilities a broadcaster might well be forced to make regular programming time available to those holding a view different from that expressed in an editorial advertisement; indeed, BEM has suggested as much in its brief. The result would be a further erosion of the journalistic discretion of broadcasters in the coverage of public issues, and a transfer of control over the treatment of public issues from the licensees who are accountable for broadcast performance to private individuals who are not. The public interest would no longer be "paramount" but, rather, subordinate to private whim especially since, under the Court of Appeals' decision, a broadcaster would be largely precluded from rejecting editorial advertisements that dealt with matters trivial or insignificant or already fairly covered by the broadcaster. 146 U. S. App. D. C., at 196 n. 36, 197, 450 F. 2d, at 657 n. 36, 658. If the Fairness Doctrine and the *Cullman* doctrine were suspended to alleviate these problems, as respondents suggest might be appropriate, the question arises whether we would have abandoned more than we have gained. Under such a regime the congressional objective of balanced coverage of public issues would be seriously threatened.

Nor can we accept the Court of Appeals' view that every potential speaker is "the best judge" of what the listening public ought to hear or indeed the best judge of the merits of his or her views. All journalistic tradition and experience is to the contrary. For better or worse, editing is what editors are for; and editing is selection and choice of material. That editors—newspaper or broadcast—can and do abuse this power is beyond doubt, but that is no reason to deny the discretion Con-

gress provided. Calculated risks of abuse are taken in order to preserve higher values. The presence of these risks is nothing new; the authors of the Bill of Rights accepted the reality that these risks were evils for which there was no acceptable remedy other than a spirit of moderation and a sense of responsibility—and civility—on the part of those who exercise the guaranteed freedoms of expression.

It was reasonable for Congress to conclude that the public interest in being informed requires periodic accountability on the part of those who are entrusted with the use of broadcast frequencies, scarce as they are. In the delicate balancing historically followed in the regulation of broadcasting Congress and the Commission could appropriately conclude that the allocation of journalistic priorities should be concentrated in the licensee rather than diffused among many. This policy gives the public some assurance that the broadcaster will be answerable if he fails to meet its legitimate needs. No such accountability attaches to the private individual, whose only qualifications for using the broadcast facility may be abundant funds and a point of view. To agree that debate on public issues should be "robust, and wide-open" does not mean that we should exchange "public trustee" broadcasting, with all its limitations, for a system of self-appointed editorial commentators.

The Court of Appeals discounted those difficulties by stressing that it was merely mandating a "modest reform," requiring only that broadcasters be required to accept some editorial advertising. 146 U. S. App. D. C., at 202, 450 F. 2d, at 663. The court suggested that broadcasters could place an "outside limit on the total amount of editorial advertising they will sell" and that the Commission and the broadcasters could develop " 'reasonable regulations' designed to prevent domination by a few groups or a few viewpoints." *Id.,* at 202,

203, 450 F. 2d, at 663, 664. If the Commission decided to apply the Fairness Doctrine to editorial advertisements and as a result broadcasters suffered financial harm, the court thought the "Commission could make necessary adjustments." *Id.*, at 203, 450 F. 2d, at 664. Thus, without providing any specific answers to the substantial objections raised by the Commission and the broadcasters, other than to express repeatedly its "confidence" in the Commission's ability to overcome any difficulties, the court remanded the cases to the Commission for the development of regulations to implement a constitutional right of access.

By minimizing the difficult problems involved in implementing such a right of access, the Court of Appeals failed to come to grips with another problem of critical importance to broadcast regulation and the First Amendment—the risk of an enlargement of Government control over the content of broadcast discussion of public issues. See, *e. g., Fowler* v. *Rhode Island,* 345 U. S. 67 (1953); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951). This risk is inherent in the Court of Appeals' remand requiring regulations and procedures to sort out requests to be heard—a process involving the very editing that licensees now perform as to regular programming. Although the use of a public resource by the broadcast media permits a limited degree of Government surveillance, as is not true with respect to private media, see *National Broadcasting Co.* v. *United States,* 319 U. S., at 216–219, the Government's power over licensees, as we have noted, is by no means absolute and is carefully circumscribed by the Act itself.[18]

Under a constitutionally commanded and Government supervised right-of-access system urged by respondents and mandated by the Court of Appeals, the Commission

---

[18] See n. 8, *supra.*

would be required to oversee far more of the day-to-day operations of broadcasters' conduct, deciding such questions as whether a particular individual or group has had sufficient opportunity to present its viewpoint and whether a particular viewpoint has already been sufficiently aired. Regimenting broadcasters is too radical a therapy for the ailment respondents complain of.

Under the Fairness Doctrine the Commission's responsibility is to judge whether a licensee's overall performance indicates a sustained good-faith effort to meet the public interest in being fully and fairly informed.[19] The Commission's responsibilities under a right-of-access system would tend to draw it into a continuing case-by-case determination of who should be heard and when. Indeed, the likelihood of Government involvement is so great that it has been suggested that the accepted constitutional principles against control of speech content would need to be relaxed with respect to editorial advertisements.[20] To sacrifice First Amendment protections for so speculative a gain is not warranted, and it was well within the Commission's discretion to construe the Act so as to avoid such a result.[21]

The Commission is also entitled to take into account the reality that in a very real sense listeners and viewers constitute a "captive audience." Cf. *Public Utilities Comm'n* v. *Pollak,* 343 U. S., at 463; *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). The "captive" nature of the broadcast audience was recognized as early as 1924,

---

[19] See Report on Editorializing by Broadcast Licensees, 13 F. C. C., at 1251–1252.

[20] See Note, 85 Harv. L. Rev. 689, 697 (1973).

[21] DNC has urged in this Court that we at least recognize a right of our national parties to purchase air time for the purpose of discussing public issues. We see no principled means under the First Amendment of favoring access by organized political parties over other groups and individuals.

when Commerce Secretary Hoover remarked at the Fourth National Radio Conference that "the radio listener does not have the same option that the reader of publications has—to ignore advertising in which he is not interested—and he may resent its invasion of his set." [22] As the broadcast media became more pervasive in our society, the problem has become more acute. In a recent decision upholding the Commission's power to promulgate rules regarding cigarette advertising, Judge Bazelon, writing for a unanimous Court of Appeals, noted some of the effects of the ubiquitous commercial:

> "Written messages are not communicated unless they are read, and reading requires an affirmative act. Broadcast messages, in contrast, are 'in the air.' In an age of omnipresent radio, there scarcely breathes a citizen who does not know some part of a leading cigarette jingle by heart. Similarly, an ordinary habitual television watcher can *avoid* these commercials only by frequently leaving the room, changing the channel, or doing some other such affirmative act. It is difficult to calculate the subliminal impact of this pervasive propaganda, which may be heard even if not listened to, but it may reasonably be thought greater than the impact of the written word." *Banzhaf* v. *FCC*, 132 U. S. App. D. C. 14, 32–33, 405 F. 2d 1082, 1100–1101 (1968), cert. denied, 396 U. S. 842 (1969).

It is no answer to say that because we tolerate pervasive commercial advertisements we can also live with its political counterparts.

The rationale for the Court of Appeals' decision imposing a constitutional right of access on the broadcast media was that the licensee impermissibly discriminates

---

[22] Reprinted in Hearings before the Senate Committee on Interstate Commerce on Radio Control, 69th Cong., 1st Sess., 54 (1926).

by accepting commercial advertisements while refusing editorial advertisements. The court relied on decisions holding that state-supported school newspapers and public transit companies were prohibited by the First Amendment from excluding controversial editorial advertisements in favor of commercial advertisements.[23] The court also attempted to analogize this case to some of our decisions holding that States may not constitutionally ban certain protected speech while at the same time permitting other speech in public areas. *Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951). This theme of "invidious discrimination" against protected speech is echoed in the briefs of BEM and DNC to this Court. Respondents also rely on our recent decisions in *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972), and *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972), where we held unconstitutional city ordinances that permitted "peaceful picketing of any school involved in a labor dispute," *id.,* at 93, but prohibited demonstrations for any other purposes on the streets and sidewalks within 150 feet of the school.

Those decisions provide little guidance, however, in resolving the question whether the First Amendment requires the Commission to mandate a private right of access to the broadcast media. In none of those cases did the forum sought for expression have an affirmative and independent statutory obligation to provide full and fair coverage of public issues, such as Congress has imposed on

---

[23] *Lee* v. *Board of Regents of State Colleges,* 306 F. Supp. 1097 (WD Wis. 1969), aff'd, 441 F. 2d 1257 (CA7 1971); *Zucker* v. *Panitz,* 299 F. Supp. 102 (SDNY 1969); *Kissinger* v. *New York City Transit Authority,* 274 F. Supp. 438 (SDNY 1967); *Hillside Community Church, Inc.* v. *City of Tacoma,* 76 Wash. 2d 63, 455 P. 2d 350 (1969); *Wirta* v. *Alameda-Contra Costa Transit District,* 68 Cal. 2d 51, 434 P. 2d 982 (1967).

all broadcast licensees. In short, there is no "discrimination" against controversial speech present in this case. The question here is not whether there is to be discussion of controversial issues of public importance on the broadcast media, but rather who shall determine what issues are to be discussed by whom, and when.

The opinion of the Court of Appeals asserted that the Fairness Doctrine, insofar as it allows broadcasters to exercise certain journalistic judgments over the discussion of public issues, is inadequate to meet the public's interest in being informed. The present system, the court held, "conforms . . . to a paternalistic structure in which licensees and bureaucrats decide what issues are 'important,' and how 'fully' to cover them, and the format, time and style of the coverage." 146 U. S. App. D. C., at 195, 450 F. 2d, at 656. The forced sale of advertising time for editorial spot announcements would, according to the Court of Appeals majority, remedy this deficiency. That conclusion was premised on the notion that advertising time, as opposed to programming time, involves a "special and separate mode of expression" because advertising content, unlike programming content, is generally prepared and edited by the advertiser. Thus, that court concluded, a broadcaster's policy against using advertising time for editorial messages "may well ignore opportunities to enliven and enrich the public's overall information." Id., at 197, 450 F. 2d, at 658. The Court of Appeals' holding would serve to transfer a large share of responsibility for balanced broadcasting from an identifiable, regulated entity—the licensee—to unregulated speakers who could afford the cost.

We reject the suggestion that the Fairness Doctrine permits broadcasters to preside over a "paternalistic" regime. See Red Lion, 395 U. S., at 390. That doctrine admittedly has not always brought to the public perfect or, indeed, even consistently high-quality treatment of all

public events and issues; but the remedy does not lie in diluting licensee responsibility. The Commission stressed that, while the licensee has discretion in fulfilling its obligations under the Fairness Doctrine, it is required to "present representative community views and voices on controversial issues which are of importance to [its] listeners," and it is prohibited from "excluding partisan voices and always itself presenting views in a bland, inoffensive manner . . . ." 25 F. C. C. 2d, at 222. A broadcaster neglects that obligation only at the risk of losing his license.

Conceivably at some future date Congress or the Commission—or the broadcasters—may devise some kind of limited right of access that is both practicable and desirable. Indeed, the Commission noted in these proceedings that the advent of cable television will afford increased opportunities for the discussion of public issues. In its proposed rules on cable television the Commission has provided that cable systems in major television markets

> "shall maintain at least one specially designated, noncommercial public access channel available on a first-come, nondiscriminatory basis. The system shall maintain and have available for public use at least the minimal equipment and facilities necessary for the production of programming for such a channel." 37 Fed Reg. 3289, § 76.251 (a)(4).

For the present, the Commission is conducting a wide-ranging study into the effectiveness of the Fairness Doctrine to see what needs to be done to improve the coverage and presentation of public issues on the broadcast media. Notice of Inquiry in Docket 19260, 30 F. C. C. 2d 26, 36 Fed. Reg. 11825. Among other things, the study will attempt to determine whether "there is any feasible method of providing access for discussion of public issues

outside the requirements of the fairness doctrine." 30 F. C. C. 2d, at 33. The Commission made it clear, however, that it does not intend to discard the Fairness Doctrine or to require broadcasters to accept all private demands for air time.[24] The Commission's inquiry on this score was announced prior to the decision of the Court of Appeals in this case and hearings are under way.

The problems perceived by the Court of Appeals majority are by no means new; as we have seen, the history of the Communications Act and the activities of the Commission over a period of 40 years reflect a continuing search for means to achieve reasonable regulation compatible with the First Amendment rights of the public and the licensees. The Commission's pending hearings are but one step in this continuing process. At the very least, courts should not freeze this necessarily dynamic process into a constitutional holding. See *American Commercial Lines, Inc.* v. *Louisville & N. R. Co.*, 392 U. S. 571, 590–593 (1968).

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEWART, concurring.

While I join Parts I and II of the Court's opinion, and the opinion in Part III, my views closely approach those expressed by MR. JUSTICE DOUGLAS concurring in the judgment.

---

[24] Subsequent to the announcement of the Court of Appeals' decision, the Commission expanded the scope of the inquiry to comply with the Court of Appeals' mandate. Further Notice of Inquiry in Docket 19260, 33 F. C. C. 2d 554, 37 Fed. Reg. 3383. After we granted certiorari and stayed the mandate of the Court of Appeals, the Commission withdrew that notice of an expanded inquiry and continued its study as originally planned. Order and Further Notice of Inquiry in Docket 19260, 33 F. C. C. 2d 798, 37 Fed. Reg. 4980.

The First Amendment prohibits the Government from imposing controls upon the press.[1]   Private broadcasters are surely part of the press.   *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 166.   Yet here the Court of Appeals held, and the dissenters today agree, that the First Amendment *requires* the Government to impose controls upon private broadcasters—in order to preserve First Amendment "values."   The appellate court accomplished this strange convolution by the simple device of holding that private broadcasters *are* Government. This is a step along a path that could eventually lead to the proposition that private *newspapers* "are" Government.   Freedom of the press would then be gone.   In its place we would have such governmental controls upon the press as a majority of this Court at any particular moment might consider First Amendment "values" to require.   It is a frightening specter.

I

There is some first-blush appeal in seeking out analogies from areas of the law where governmental involvement on the part of otherwise private parties has led the Court to hold that certain activities of those parties were tantamount to governmental action.[2]   The evolution of the "state action" concept under the Fourteenth Amendment is one available analogy.[3]   Another is the decision of this

---

[1] U. S. Const., Amdt. I, provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

[2] See *Amalgamated Food Employees* v. *Logan Valley Plaza*, 391 U. S. 308; *Railway Employes' Dept.* v. *Hanson*, 351 U. S. 225; *Public Utilities Comm'n* v. *Pollak*, 343 U. S. 451; *Marsh* v. *Alabama*, 326 U. S. 501.

[3] "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental

Court in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, where a policy of a privately owned but publicly regulated bus company that had been approved by the regulatory commission was held to activate First Amendment review. The First Amendment has also been held applicable where private parties control essentially public forums. *Amalgamated Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308, *Marsh* v. *Alabama,* 326 U. S. 501; cf. *Lloyd Corp.* v. *Tanner,* 407 U. S. 551.

The problem before us, however, is too complex to admit of solution by simply analogizing to cases in very different areas. For we deal here with the electronic press, that is itself protected from Government by the First Amendment.[4] Before woodenly accepting analogies from cases dealing with quasi-public racial discrimination, regulated industries other than the press, or "company towns," we must look more closely at the structure of broadcasting and the limits of governmental regulation of licensees.

When Congress enacted the Radio Act of 1927, 44 Stat. 1162, and followed it with the Federal Communications Act of 1934, 48 Stat. 1064, 47 U. S. C. § 151 *et seq.,* it was responding to a then-evident need to regulate access to the public airwaves. Not every member of the public could broadcast over the air as he chose, since the scarcity

---

character as to become subject to the constitutional limitations placed upon state action." *Evans* v. *Newton,* 382 U. S. 296, 299. Earlier, in *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, the Court held that a privately owned restaurant located within a public parking garage was sufficiently involved with state authority to bring its racially discriminatory actions within the proscription of the Fourteenth Amendment.

[4] See, *e. g., United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 166. The Federal Communications Act also prohibits the Commission from interfering with "the right of free speech by means of radio communication." 47 U. S. C. § 326.

of frequencies made this a sure road to chaos.[5]   The system selected by the Congress was a hybrid.   The Federal Radio Commission (succeeded by the Federal Communications Commission), was to license broadcasters for no more than three-year periods.   47 U. S. C. § 307 (d).   The licensees, though subject to some public regulation, were to be private companies.

Scarcity meant more than a need to limit access.   Because access was to be limited, it was thought necessary for the regulatory apparatus to take into account the public interest in obtaining "the best practicable service to the community reached by his [the licensee's] broadcasts."   *FCC* v. *Sanders Brothers Radio Station,* 309 U. S. 470, 475.   Public regulation has not, then, been merely a matter of electromagnetic engineering for the sake of keeping signals clear.   It has also included some regulation of programming.   Writing in defense of Commission regulations regarding chain broadcasting, Mr. Justice Frankfurter said: "These provisions [of the Act], individually and in the aggregate, preclude the notion that the Commission is empowered to deal only with technical and engineering impediments to the 'larger and more effective use of radio in the public interest.' " *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 217.

Over time, federal regulation of broadcasting in the public interest has been extensive, and, *pro tanto,* has rightly or wrongly been held to be tolerable under the First Amendment.   We now have the Fairness Doctrine, with its personal-attack, editorial-reply, and fair-coverage-of-controversial-issue requirements.[6]   In *Red Lion Broad-*

---

[5] For a history of regulatory legislation regarding broadcasters, see *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 375–386; *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 210–214.

[6] The personal-attack and editorial-reply rules appear at 47 CFR §§ 73.123, 73.300, 73.598, 73.679.   The public issue aspect of the

*casting Co.* v. *FCC*, 395 U. S. 367, this Doctrine was held to constitute permissible governmental regulation of broadcasters, despite the First Amendment. The Court said:

> "Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish. . . .
>
> ". . . Because of the scarcity of radio frequencies, the Government is permitted to put restraints on licensees in favor of others whose views should be expressed on this unique medium. But the people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Id.,* at 388, 390.

The Fairness Doctrine has been held applicable to paid advertising as well as to other programming, *Banzhaf* v. *FCC,* 132 U. S. App. D. C. 14, 405 F. 2d 1082. And the public interest in broadcasting has been recognized as a rationale for liberalized standing on the part of listener

---

Fairness Doctrine requires the broadcaster to give adequate coverage to public issues, fairly reflecting divergent views. *United Broadcasting Co.,* 10 F. C. C. 515; *New Broadcasting Co.,* 6 P & F Radio Reg. 258; see generally Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 Fed. Reg. 10415. This coverage must be provided at the broadcaster's own expense if necessary, *Cullman Broadcasting Co.,* 25 P & F Radio Reg. 895, and the duty must be met by providing programming obtained at the licensee's own initiative if it is available from no other source. *John J. Dempsey,* 6 P & F Radio Reg. 615.

groups in Commission licensing proceedings. *Office of Communication of United Church of Christ* v. *FCC,* 123 U. S. App. D. C. 328, 359 F. 2d 994.

Throughout this long history of regulation, however, it has been recognized that broadcasters retain important freedoms, and that the Commission's regulatory power has limits. Quite apart from what may be required by the First Amendment itself, the regulatory legislation makes clear what some of these freedoms are. Section 3 (h) of the Act, 47 U. S. C. § 153 (h), provides that broadcasters are not to be treated as common carriers. Were broadcasters common carriers within the meaning of the Act, they would be subject to 47 U. S. C. §§ 201, 202. Section 201 provides, in pertinent part, that:

> "(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service · upon reasonable request therefor . . . ."

Section 202 provides that:

> "(a) It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."

The Act also specifically gives licensees "freedom of speech":

> "Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals

transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication." 47 U. S. C. § 326.

Thus, when examined as a whole, the Federal Communications Act establishes a system of privately owned broadcast licensees. These licensees, though regulated by the Commission under a fairly broad "public interest" standard, have, quite apart from whatever additional protections the First Amendment may provide, important statutory freedoms in conducting their programming.

In *Red Lion, supra,* this Court held that, despite the First Amendment, the Commission may impose a so-called Fairness Doctrine upon broadcasters, requiring them to present balanced coverage of various and conflicting views on issues of public importance. I agreed with the Court in *Red Lion,* although with considerable doubt, because I thought that that much Government regulation of program content was within the outer limits of First Amendment tolerability. Were the Commission to require broadcasters to accept some amount of editorial advertising as part of the public interest mandate upon which their licenses are conditional, the issue before us would be in the same posture as was the Fairness Doctrine itself in *Red Lion,* and we would have to determine whether this additional governmental control of broadcasters was consistent with the statute and tolerable under the First Amendment. Here, however, the Commission imposed no such requirement, but left private broadcasters free to accept or reject such advertising as they saw fit. The Court of Appeals held that the First Amendment *compels* the Commission to require broadcasters to accept such advertising, because it equated broadcaster action with governmental action.

This holding not only raises a serious statutory question under § 3 (h) of the Act, which provides that broadcasters are not common carriers, but seems to me to reflect an extraordinarily odd view of the First Amendment.

The dissenting opinion today argues, in support of the decision of the Court of Appeals, that only a *limited* right of access is sought by the respondents and required by the First Amendment, and that such a limited right would not turn broadcasters into common carriers. The respondents argue, somewhat differently, that the Constitution requires that only "responsible" individuals and groups be given the right to purchase advertising. These positions are said to be arrived at by somehow balancing "competing First Amendment values." But if private broadcasters *are* Government, how can the First Amendment give only a *limited* right to those who would speak? Since when has the First Amendment given Government the right to silence all speakers it does not consider "responsible?"

The First Amendment protects the press *from* governmental interference; it confers no analogous protection *on* the Government.[7] To hold that broadcaster action is governmental action would thus simply strip broadcasters of their own First Amendment rights. They would be obligated to grant the demands of all citizens to be heard over the air, subject only to reasonable regulations as to "time, place and manner." Cf. *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 98; *Cox* v. *Louisiana,*

---

[7] Government is not restrained by the First Amendment from controlling its own expression, cf. *New York Times Co.* v. *United States,* 403 U. S. 713, 728–729 (Stewart, J., concurring). As Professor Thomas Emerson has written, "The purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents." The System of Freedom of Expression 700 (1970).

379 U. S. 536, 554; *Poulos* v. *New Hampshire*, 345 U. S. 395; *Cox* v. *New Hampshire*, 312 U. S. 569. If, as the dissent today would have it, the proper analogy is to public forums [8]—that is, if broadcasters are Government for First Amendment purposes—then broadcasters are inevitably drawn to the position of common carriers. For this is precisely the status of Government with respect to public forums—a status mandated by the First Amendment.[9]

To hold that broadcaster action is governmental action would thus produce a result wholly inimical to the broadcasters' own First Amendment rights, and wholly at odds with the broadcasting system established by Congress and with our many decisions [10] approving those legislative

---

[8] "[T]he right to speak can flourish only if it is allowed to operate in an effective forum—whether it be a public park, a schoolroom, a town meeting hall, a soapbox, or a radio and television frequency." *Post*, at 193.

[9] Professor Emerson has recognized the scope of the "access" argument: "The licensee therefore can only be considered as the agent of the government, or trustee of the public, in a process of further allocation. Hence the licensee would have no direct First Amendment rights of his own, except as to his own expression." *Supra*, n. 7, at 663.

Though the licensee would be free to say what it wished during its *own* broadcasting, whatever that might mean, it seems clear that the licensee would have no special claim to broadcast time and would lose entirely the freedom to program and schedule according to its own judgment, values, and priorities. Cf. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 98; *Cox* v. *Louisiana*, 379 U. S. 536, 554; *Poulos* v. *New Hampshire*, 345 U. S. 395; *Cox* v. *New Hampshire*, 312 U. S. 569. Licensees would be forced to develop a procedurally fair and substantively nondiscriminatory system for controlling access, and in my view this is precisely what Congress intended to avoid through § 3 (h) of the Act.

[10] *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367; *National Broadcasting Co.* v. *United States*, 319 U. S. 190; *FCC* v. *Sanders Brothers Radio Station*, 309 U. S. 470; *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134.

provisions.[11]   As Judge McGowan wrote, dissenting from the judgment of the Court of Appeals in these cases,

> "This is the system which Congress has, wisely or not, provided as the alternative to public ownership and operation of radio and television communications facilities.   This approach has never been thought to be other than within the permissible limits of constitutional choice."   146 U. S. App. D, C. 181, 205, 450 F. 2d 642, 666.

## II

Part IV of the Court's opinion, as I understand it, seems primarily to deal with the respondents' statutory argument—that the obligation of broadcasters to operate in the "public interest" supports the judgment of the Court of Appeals.   Yet two of my concurring Brethren understand Part IV as a discussion of the First Amendment issue that would exist in these cases were the action of broadcasters to be equated with governmental action. So, according to my Brother BLACKMUN, "the governmental action issue does not affect the outcome of this case."   Post, at 148.   The Court of Appeals also conflated the constitutional and statutory issues in these cases.   It reasoned that whether its decision "is styled as a 'First Amendment decision' or as a decision interpreting the fairness and public interest requirements 'in light of the First Amendment' matters little."   146 U. S. App. D. C., at 188, 450 F. 2d, at 649.

---

[11] None of this suggests any disagreement on my part with the evolution of "state action" under the Fourteenth Amendment.   I recognize that if *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, were relevant, the fact that the Commission considered and rejected a challenge to broadcaster policy might be sufficient to constitute "state action."   This, in fact, was the basis of the Court's decision in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451.

I find this reasoning quite wrong and wholly disagree with it, for the simple reason that the First Amendment and the public interest standard of the statute are not coextensive. The two are related in the sense that the Commission could not "in the public interest" place a requirement on broadcasters that constituted a violation of their First Amendment rights. The two are also related in the sense that both foster free speech. But we have held that the Commission can under the statute require broadcasters to do certain things "in the public interest" that the First Amendment would not require if the broadcasters *were* the Government. For example, the Fairness Doctrine is an aspect of the "public interest" regulation of broadcasters that would not be compelled or even permitted by the First Amendment itself if broadcasters were the Government.[12]

If the "public interest" language of the statute were intended to enact the substance of the First Amendment, a discussion of whether broadcaster action is governmental action would indeed be superfluous. For anything that Government could not do because of the First Amendment, the broadcasters could not do under the statute. But this theory proves far too much, since it would make the statutory scheme, with its emphasis on

---

[12] The basis for a Fairness Doctrine is statutory, not constitutional. As the Court said in *Red Lion*:

"In light of the fact that the 'public interest' in broadcasting clearly encompasses the presentation of vigorous debate of controversial issues of importance and concern to the public; the fact that the FCC has rested upon that language from its very inception a doctrine that these issues must be discussed, and fairly; and the fact that Congress has acknowledged that the analogous provisions of § 315 are not preclusive in this area, and knowingly preserved the FCC's complementary efforts, we think the fairness doctrine and its component personal attack and political editorializing regulations are a legitimate exercise of congressionally delegated authority." 395 U. S., at 385.

broadcaster discretion and its proscription on interference with "the right of free speech by means of radio communication," a nullity. Were the Government really operating the electronic press, it would, as my Brother DOUGLAS points out, be *prevented* by the First Amendment from selection of broadcast content and the exercise of editorial judgment. It would not be permitted in the name of "fairness" to deny time to any person or group on the grounds that their views had been heard "enough." Yet broadcasters perform precisely these functions and enjoy precisely these freedoms under the Act. The constitutional and statutory issues in these cases are thus quite different.

In evaluating the statutory claims, the starting point must be the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." *Red Lion,* 395 U. S., at 381.

Though I have no doubt that the respondents here were attempting to communicate what they considered to be important messages, it does not follow that the Commission erred when it refused to require every broadcaster to communicate those messages. Contrary to what is said in dissent today, it is not the case that a seller of goods is granted instant access to the media, while someone "seeking to discuss war, peace, pollution, or the suffering of the poor is denied this right to speak." *Post,* at 200. There is no indication that the thousands of broadcasters regulated by the Commission have anything like a uniform policy of turning down "controversial" or "editorial" advertising. In the cases before us, the Business Executives' spot advertisements were rejected by a single radio station. Of the three television networks, only one turned down the Democratic National Committee's request for air time. We are told that many, if not most, broadcasters *do* accept advertising of

the type at issue here. This variation in broadcaster policy reflects the very kind of diversity and competition that best protects the free flow of ideas under a system of broadcasting predicated on private management.[13]

Even though it would be in the public interest for the respondents' advertisements to be heard, it does not follow that the public interest requires *every* broadcaster to broadcast them. And it certainly does not follow that the public interest would be served by *forcing* every broadcaster to accept any particular kind of advertising. In the light of these diverse broadcaster policies—and the serious First Amendment problem that a contrary ruling would have presented—there are surely no "compelling indications" that the Commission misunderstood its statutory responsibility.

## III

There is never a paucity of arguments in favor of limiting the freedom of the press. The Court of Appeals concluded that greater Government control of press freedom is acceptable here because of the scarcity of frequencies for broadcasting. But there are many more broadcasting stations than there are daily newspapers.[14] And it

---

[13] The Democratic National Committee cited this very lack of uniformity as a reason for seeking a declaratory ruling from the Commission. There was too much diversity, it thought, for it to plan effectively an advertising campaign. In the DNC's request for a declaratory ruling before the Commission, it stated:

"In addition to the three national commercial networks, as of April 1, 1970, there were, on the air, 509 commercial VHF television stations, 180 commercial UHF stations, 4,280 standard broadcast stations, and 2,111 commercial FM stations. While several of these stations have common owners, it does not necessarily follow that every station owned by an individual or group would follow the same policies."

[14] There are 1,792 daily newspapers in the United States. Ayer *Directory of Publications* viii (1973). Compare the number of broadcasters, n. 13, *supra*.

would require no great ingenuity to argue that newspapers too *are* Government. After all, newspapers get Government mail subsidies and a limited antitrust immunity.[15] The reasoning of the Court of Appeals would then lead to the conclusion that the First Amendment requires that newspapers, too, be compelled to open their pages to all comers.

Perhaps I overstate the logic of the opinion of the Court of Appeals. Perhaps its "balancing" of First Amendment "values" would require no more than that newspapers be compelled to give "limited" access to dissident voices, and then only if those voices were "responsible." And perhaps it would require that such access be compelled only when there was a single newspaper in a particular community. But it would be a close question for me which of these various alternative results would be more grossly violative of the First Amendment's guarantee of a free press. For that guarantee gives *every* newspaper the liberty to print what it chooses and reject what it chooses, free from the intrusive editorial thumb of Government.

I profoundly trust that no such reasoning as I have attributed to the Court of Appeals will ever be adopted by this Court. And if I have exaggerated, it is only to make clear the dangers that beset us when we lose sight of the First Amendment itself, and march forth in blind pursuit of its "values."

Those who wrote our First Amendment put their faith in the proposition that a free press is indispensable to a free society. They believed that "fairness" was far too fragile to be left for a Government bureaucracy to accom-

---

[15] Newspapers and other periodicals receive a Government subsidy in the form of second-class postage rates, 39 CFR § 132. An antitrust immunity is established by the Newspaper Preservation Act, 15 U. S. C. § 1801 *et seq.*

plish. History has many times confirmed the wisdom of their choice.

This Court was persuaded in *Red Lion* to accept the Commission's view that a so-called Fairness Doctrine was required by the unique electronic limitations of broadcasting, at least in the then-existing state of the art. Rightly or wrongly, we there decided that broadcasters' First Amendment rights were "abridgeable." But surely this does not mean that those rights are nonexistent. And even if all else were in equipoise, and the decision of the issue before us were finally to rest upon First Amendment "values" alone, I could not agree with the Court of Appeals. For if those "values" mean anything, they should mean at least this: If we must choose whether editorial decisions are to be made in the free judgment of individual broadcasters, or imposed by bureaucratic fiat, the choice must be for freedom.

MR. JUSTICE WHITE, concurring.

I join Parts I, II, and IV of the Court's opinion and its judgment. I do not, however, concur in the Part III opinion.

I do not suggest that the conduct of broadcasters must always, or even often, be considered that of a government for the purposes of the First Amendment. But it is at least arguable, and strongly so, that the Communications Act and the policies of the Commission, including the Fairness Doctrine, are here sufficiently implicated to require review of the Commission's orders under the First Amendment. For myself, the heart of the argument is simply stated. The claim in these cases was that the Communications Act and the First Amendment should be interpreted to confer a right of access on those who wished to buy time for editorial advertising and to raise political funds. The Commission rejected both the statutory and constitutional positions. To confer a right

of access, it said, would be contrary to the Communications Act and to the policies adopted by the Commission to implement that Act. Congress intended that the Fairness Doctrine be complied with, but it also intended that broadcasters have wide discretion with respect to the method of compliance. There is no requirement that broadcasters accept editorial ads; they could, instead, provide their own programs, with their own format, opinion and opinion sources. Congress intended that there be no *right* of access such as claimed in these cases; and, in the Commission's view, to recognize that right would require major revisions in statutory and regulatory policy. The Commission also ruled, contrary to the views of its dissenting member, that rejection of the asserted right of access was wholly consistent with the First Amendment.

In this context I am not ready to conclude, as is done in the Part III opinion, that the First Amendment may be put aside for lack of official action necessary to invoke its proscriptions. But, assuming, *arguendo,* as the Court does in Part IV of its opinion, that Congress or the Commission is sufficiently involved in the denial of access to the broadcasting media to require review under the First Amendment, I would reverse the judgment of the Court of Appeals. Given the constitutionality of the Fairness Doctrine, and accepting Part IV of the Court's opinion, I have little difficulty in concluding that statutory and regulatory recognition of broadcaster freedom and discretion to make up their own programs and to choose their method of compliance with the Fairness Doctrine is consistent with the First Amendment.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE POWELL joins, concurring.

In Part IV the Court determines "whether, assuming governmental action, broadcasters are required" to ac-

cept editorial advertisements "by reason of the First Amendment." *Ante,* at 121. The Court concludes that the Court of Appeals erred when it froze the "continuing search for means to achieve reasonable regulation compatible with the First Amendment rights of the public and the licensees" into "a constitutional holding." *Ante,* at 132. The Court's conclusion that the First Amendment does not compel the result reached by the Court of Appeals demonstrates that the governmental action issue does not affect the outcome of this case. I therefore refrain from deciding it.

MR. JUSTICE DOUGLAS, concurring in the judgment.

While I join the Court in reversing the judgment below, I do so for quite different reasons.

My conclusion is that TV and radio stand in the same protected position under the First Amendment as do newspapers and magazines. The philosophy of the First Amendment requires that result, for the fear that Madison and Jefferson had of government intrusion is perhaps even more relevant to TV and radio than it is to newspapers and other like publications. That fear was founded not only on the spectre of a lawless government but of government under the control of a faction that desired to foist its views of the common good on the people. In popular terms that view has been expressed as follows:

> "The ground rules of our democracy, as it has grown, require a free press, not necessarily a responsible or a temperate one. There aren't any halfway stages. As Aristophanes saw, democracy means that power is generally conferred on second-raters by third-raters, whereupon everyone else, from first-raters to fourth-raters, moves with great glee to try to dislodge them. It's messy but most politicians under-

stand that it can't very well be otherwise and still be a democracy." Stewart, reviewing Epstein, News From Nowhere: Television and the News (1972), Book World, Washington Post, March 25, 1973, pp. 4–5.

I

Public broadcasting, of course, raises quite different problems from those tendered by the TV outlets involved in this litigation.

Congress has authorized the creation of the Corporation for Public Broadcasting, whose Board of Directors is appointed by the President by and with the advice and consent of the Senate. 47 U. S. C. § 396. A total of 223 television and 560 radio stations made up this nationwide public broadcasting system as of June 30, 1972. See 1972 Corporation for Public Broadcasting Annual Report. It is a nonprofit organization and by the terms of § 396 (b) is said not to be "an agency or establishment of the United States Government." Yet, since it is a creature of Congress whose management is in the hands of a Board named by the President and approved by the Senate, it is difficult to see why it is not a federal agency engaged in operating a "press" as that word is used in the First Amendment. If these cases involved that Corporation, we would have a situation comparable to that in which the United States owns and manages a prestigious newspaper like the New York Times, Washington Post, or Sacramento Bee. The Government as owner and manager would not, as I see it, be free to pick and choose such news items as it desired. For by the First Amendment it may not censor or enact or enforce any other "law" abridging freedom of the press. Politics, ideological slants, rightist or leftist tendencies could play no part in its design of programs. See Markel, Will It be Public or Private TV?, World, Mar. 13, 1973, p. 57;

Shales, WGBH–TV: An Ultimatum Against "Improper" White House Influence, Washington Post, Apr. 27, 1973, p. E2. More specifically, the programs tendered by the respondents in the present cases could not then be turned down.

Governmental action may be evidenced by various forms of supervision or control of private activities. *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715. I have expressed the view that the activities of licensees of the government operating in the public domain are governmental actions, so far as constitutional duties and responsibilities are concerned. See *Garner* v. *Louisiana,* 368 U. S. 157, 183–185 (concurring); *Lombard* v. *Louisiana,* 373 U. S. 267, 281 (concurring); *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 179 (dissenting). It is somewhat the same idea expressed by the first Mr. Justice Harlan in his dissent in *Plessy* v. *Ferguson,* 163 U. S. 537, 554. But that view has not been accepted. If a TV or radio licensee were a federal agency, the thesis of my Brother BRENNAN would inexorably follow. For a licensee of the Federal Government would be in precisely the situation of the Corporation for Public Broadcasting. A licensee, like an agency of the Government, would within limits of its time be bound to disseminate all views. For, being an arm of the Government, it would be unable by reason of the First Amendment to "abridge" some sectors of thought in favor of others. The Court does not, however, decide whether a broadcast licensee is a federal agency within the context of these cases.

II

If a broadcast licensee is not engaged in governmental action for purposes of the First Amendment, I fail to see how constitutionally we can treat TV and radio differently than we treat newspapers. It would come

as a surprise to the public as well as to publishers and editors of newspapers to be informed that a newly created federal bureau would hereafter provide "guidelines" for newspapers or promulgate rules that would give a federal agency power to ride herd on the publishing business to make sure that fair comment on all current issues was made. In 1970 Congressman Farbstein introduced a bill,[1] never reported out of the Committee, which provided that any newspaper of general circulation published in a city with a population greater than 25,000 and in which only one separately owned newspaper of general circulation is published "shall provide a reasonable opportunity for a balanced presentation of conflicting views on issues of public importance" and giving the Federal Communications Commission power to enforce the requirement.

Thomas I. Emerson, our leading First Amendment scholar, has stated that:

> "[A]ny effort to solve the broader problems of a monopoly press by forcing newspapers to cover all 'newsworthy' events and print all viewpoints, under the watchful eyes of petty public officials, is likely to undermine such independence as the press now shows without achieving any real diversity." The System of Freedom of Expression 671 (1970).

The sturdy people who fashioned the First Amendment would be shocked at that intrusion of Government into a field which in this Nation has been reserved for individuals, whatever part of the spectrum of opinion they represent. Benjamin Franklin, one of the Founders who was in the newspaper business, wrote in simple and graphic form what I had always assumed was the basic

---

[1] H. R. 18927, 91st Cong., 2d Sess.

American newspaper tradition that became implicit in the First Amendment. In our early history one view was that the publisher must open his columns

> "to any and all controversialists, especially if paid for it. Franklin disagreed, declaring that his newspaper was not a stagecoach, with seats for everyone; he offered to print pamphlets for private distribution, but refused to fill his paper with private altercations." [2]  F. Mott, American Journalism 55 (3d ed. 1962).

It is said that TV and radio have become so powerful and exert such an influence on the public mind that they must be controlled by Government.[3]  Some

---

[2] Congress provided in 47 U. S. C. § 153 (h) that "a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier."

[3] "To say that the media have great decisionmaking powers without defined legal responsibilities or any formal duties of public accountability is both to overestimate their power and to put forth a meaningless formula for reform. How shall we make the *New York Times* 'accountable' for its anti-Vietnam policy? Require it to print letters to the editor in support of the war? If the situation is as grave as stated, the remedy is fantastically inadequate. But the situation is not that grave. The *New York Times*, the *Chicago Tribune*, NBC, ABC, and CBS play a role in policy formation, but clearly they were not alone responsible, for example, for Johnson's decision not to run for re-election, Nixon's refusal to withdraw the troops from Vietnam, the rejection of the two billion dollar New York bond issue, the defeat of Carswell and Haynsworth, or the Supreme Court's segregation, reapportionment and prayer decisions. The implication that the people of this country—except the proponents of the theory—are mere unthinking automatons manipulated by the media, without interests, conflicts, or prejudices is an assumption which I find quite maddening. The development of constitutional doctrine should not be based on such hysterical overestimation of media power and underestimation of the good sense of the American public." Jaffe, The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access, 85 Harv. L. Rev. 768, 786–787 (1972).

newspapers in our history have exerted a powerful—and some have thought—a harmful interest on the public mind. But even Thomas Jefferson, who knew how base and obnoxious the press could be, never dreamed of interfering. For he thought that government control of newspapers would be the greater of two evils.[4]

> "I deplore . . . the putrid state into which our newspapers have passed, and the malignity, the vulgarity, and mendacious spirit of those who write them. . . . These ordures are rapidly depraving the public taste.
>
> "It is however an evil for which there is no remedy, our liberty depends on the freedom of the press, and that cannot be limited without being lost."

Of course there is private censorship in the newspaper field. But for one publisher who may suppress a fact, there are many who will print it. But if the Government is the censor, administrative *fiat*, not freedom of choice, carries the day.

As stated recently by Harry Kalven, Jr.:

> "It is an insufficiently noticed aspect of the First Amendment that it contemplates the vigorous use of self-help by the opponents of given doctrines, ideas, and political positions. It is not the theory that all ideas and positions are entitled to flourish under freedom of discussion. It is rather then that they must survive and endure against hostile criticism. There is perhaps a paradox in that the suppression of speech by speech is part and parcel of the principle of freedom of speech. Indeed, one big reason why policy dictates that government keep its hands off communication is that, in this area, self-help of criticism is singularly effective. . . .
>
> "Free, robust criticism of government, its officers, and its policy is the essence of the democratic

---

[4] T. Jefferson, Democracy 150–151 (Padover ed. 1939).

dialectic—of 'the belief,' again to quote Brandeis, 'in the power of reason as applied through public discussion.' The government cannot reciprocally criticize the performance of the press, its officers, and its policies without its criticism carrying implications of power and coercion. The government simply cannot be another discussant of the press's perform- ance. Whether it will it or not, it is a critic who carries the threat of the censor and more often than not it wills it. Nor is it at all clear that its voice will be needed; surely there will be others to cham- pion its view of the performance of the press.

"The balance struck, then, is avowedly, and even enthusiastically, one-sided. The citizen may criticize the performance and motives of his government. The government may defend its performance and its policies, but it may not criticize the performance and motives of its critics." 6 The Center Maga- zine, No. 3, pp. 36–37 (May/June 1973).

*Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, in a carefully written opinion that was built upon prede- cessor cases, put TV and radio under a different regime. I did not participate in that decision and, with all respect, would not support it. The Fairness Doctrine has no place in our First Amendment regime. It puts the head of the camel inside the tent and enables administration after administration to toy with TV or radio in order to serve its sordid or its benevolent ends. In 1973—as in other years—there is clamoring to make TV and radio emit the messages that console certain groups. There are charges that these mass media are too slanted, too partisan, too hostile in their approach to candidates and the issues.

The same cry of protest has gone up against the newspapers and magazines. When Senator Joseph Mc-

Carthy was at his prime, holding in his hand papers containing the names of 205 "Communists" in the State Department (R. Feuerlicht, Joe McCarthy and Mc-Carthyism 54 (1972)), there were scarcely a dozen papers in this Nation that stood firm for the citizen's right to due process and to First Amendment protection. That, however, was no reason to put the saddle of the federal bureaucracy on the backs of publishers. Under our Bill of Rights people are entitled to have extreme ideas, silly ideas, partisan ideas.

The same is true, I believe, of TV and radio. At times they have a nauseating mediocrity. At other times they show the dazzling brilliance of a Leonard Bernstein; and they very often bring humanistic influences of far-away people into every home.

Both TV and radio news broadcasts frequently tip the news one direction or another and even try to turn a public figure into a character of disrepute. Yet so do the newspapers and the magazines and other segments of the press. The standards of TV, radio, newspapers, or magazines—whether of excellence or mediocrity—are beyond the reach of Government. Government—acting through courts—disciplines lawyers. Government makes criminal some acts of doctors and of engineers. But the First Amendment puts beyond the reach of Government federal regulation of news agencies save only business or financial practices which do not involve First Amendment rights. Conspicuous is *Associated Press* v. *United States*, 326 U. S. 1, where enforcement of the antitrust laws against a news-gathering agency was held to be not inconsistent with First Amendment rights.

Government has no business in collating, dispensing, and enforcing, subtly or otherwise, any set of ideas on the press. Beliefs, proposals for change, clamor for controls, protests against any governmental regime are pro-

tected by the First Amendment against governmental ban or control.

There has been debate over the meaning of the First Amendment as applied to the States by reason of the Fourteenth. Some have thought that at the state level the First Amendment was somewhat "watered down" and did not have the full vigor which it had as applied to the Federal Government. See *Roth* v. *United States,* 354 U. S. 476, 502–503 (Harlan, J., concurring). So far, that has been the minority view. See *Malloy* v. *Hogan,* 378 U. S. 1, 10. But it is quite irrelevant here, for the First Amendment, like other parts of the Bill of Rights, was at the outset applicable only to the Federal Government.[5] The First Amendment is written in terms that are absolute. Its command is that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

That guarantee, can, of course, be changed by a constitutional amendment which can make all the press or segments of the press organs of Government and thus control the news and information which people receive. Such a restructuring of the First Amendment cannot be done by judicial fiat or by congressional action. The ban of "no" law that abridges freedom of the press is in my view total and complete.[6] The Alien and Sedition Acts, 1 Stat. 566, 570, 596, passed early in our history were

---

[5] *Barron* v. *Mayor of Baltimore,* 7 Pet. 243.

[6] The press in this country, like that of Britain, was at one time subject to contempt for its comments on pending litigation. *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402. But that position was changed. See *Bridges* v. *California,* 314 U. S. 252, 267. Federal habeas corpus, however, is available to give a man his freedom and the prosecution an opportunity for a new trial where the conduct of the press has resulted in an unfair trial. *Sheppard* v. *Maxwell,* 384 U. S. 333. And change of venue may be had where the local atmosphere has saturated the community with prejudice. See *Rideau* v. *Louisiana,* 373 U. S. 723.

plainly unconstitutional, as Jefferson believed. Jefferson, indeed, said that by reason of the First Amendment

"libels, falsehood, and defamation, equally with heresy and false religion, are withheld from the cognizance of federal tribunals. That therefore the act of the Congress of the United States, passed on the 14th of July, 1798, entitled 'An Act in Addition to the Act entitled "An Act for the Punishment of certain Crimes against the United States," ' which does abridge the freedom of the press, is not law, but is altogether void, and of no force." 4 J. Elliot's Debates on the Federal Constitution 541 (1876).

And see 15 Writings of Thomas Jefferson 214 (Memorial ed. 1904); 14 *id.*, at 116; 11 *id.*, at 43–44.

Those Acts had but a short life, and we never returned to them. We have, however, witnessed a slow encroachment by Government over that segment of the press that is represented by TV and radio licensees. Licensing is necessary for engineering reasons; the spectrum is limited and wavelengths must be assigned to avoid stations interfering [7] with each other. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S., at 388. The Commission has a duty to encourage a multitude of voices but only in

---

[7] The Senate Report which accompanied the bill that became the Radio Act of 1927, 44 Stat. 1162 stated:

"If the channels of radio transmission were unlimited in number the importance of the regulatory body would be greatly lessened, but these channels are limited and restricted in number and the decision as to who shall be permitted to use them and on what terms and for what periods of time, together with the other questions connected with the situation, requires the exercise of a high order of discretion and the most careful application of the principles of equitable treatment to all the classes and interests affected. For these and other reasons your committee decided that all power to regulate radio communication should be centered in one independent body, a radio commission, granting it full and complete authority over the entire subject of radio." S. Rep. 772, 69th Cong., 1st Sess., 3.

a limited way, *viz.*, by preventing monopolistic practices and by promoting technological developments that will open up new channels.[8]   But censorship [9] or editing or the screening by Government of what licensees may broadcast goes against the grain of the First Amendment.

The Court in *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 226, said, "Unlike other modes of

---

[8] Scarcity may soon be a constraint of the past, thus obviating the concerns expressed in *Red Lion.* It has been predicted that it may be possible within 10 years to provide television viewers 400 channels through the advances of cable television.   R. Smith, The Wired Nation 7 (1972); see *Brandywine-Main Line Radio, Inc.* v. *FCC,* 153 U. S. App. D. C. 305, 362–365, 473 F. 2d 16, 73–76 (Bazelon, J., dissenting).

[9] Currently, press censorship covers most of the globe.   In Brazil the present regime of censorship is pervasive.   As reported in the New York Times for Feb. 17, 1973, p. 11:

"The censors' rules, issued a few months ago and constantly amended, cover a vast field and if strictly applied would leave the press little to discuss.   In practice, however, much depends on the whims and suspicions of the local censors.

"General prohibitions include protests against censorship, any discussion of a successor to President Emilio Garrastazu Médici, whose term is up in 1974, campaigns against the Government's special powers by decree and sensational news that might hurt the image of Brazil.

"Others are campaigns to discredit the national housing program, the financial market or other matters of vital importance to the Government, the playing up of assaults on banks or credit establishments, tension between the Roman Catholic Church and the state, agitation in union and student circles, and publicity for Communist personalities and nations.   Criticism of state governors and 'exaltation of immorality' through news of homosexuality, prostitution and drugs are also barred.

"The most controversial order, issued by the Minister of Justice last September, bans all news, comment or interviews on a political relaxation of the regime, on democracy for Brazil, and on the economic and financial situation in general."

expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation."

That uniqueness is due to engineering and technical problems. But the press in a realistic sense is likewise not available to all. Small or "underground" papers appear and disappear; and the weekly is an established institution. But the daily papers now established are unique in the sense that it would be virtually impossible for a competitor to enter the field due to the financial exigencies of this era. The result is that in practical terms the newspapers and magazines, like TV and radio, are available only to a select few. Who at this time would have the folly to think he could combat the New York Times or Denver Post by building a new plant and becoming a competitor? That may argue for a redefinition of the responsibilities of the press in First Amendment terms.[10]   But I do not think it gives us

---

[10] Indeed, it can be argued that the existence of newspapers, and thus their access to the public, is dependent upon the preferential mailing privileges newspapers receive through second-class postage rates. This is a privilege afforded by the Government, and, as my Brother Stewart recognizes, a form of subsidy.

Under the Postal Reorganization Act, the new Postal Rate Commission is empowered to fix postage rates at levels high enough to make each class of mail pay its own way. John Fischer reports that the increase in second-class mail rates for magazines and periodicals (127%) is "nothing less than a death sentence for an unpredictable number of publications." The Easy Chair, Harper's Magazine 30, 31 (May 1973). It is not the established giants of the publishing field that will suffer most, for it is estimated that some 10,000 magazines and small newspapers will be forced out of existence. *Id.*, at 30. Fischer mentions specifically the National Review, Human Events, The Nation, and The New Republic. These are the publications that offer us the rich diversity of opinion and

carte blanche to design systems of supervision and control or empower Congress to read the mandate in the First Amendment that "Congress shall make no law . . . abridging the freedom . . . of the press" to mean that Congress may, acting directly or through any of its agencies such as the FCC make "some" laws "abridging" freedom of the press.

Powerful arguments, summarized and appraised in T. Emerson, The System of Freedom of Expression, cc. XVII and XVIII (1970), can be made for revamping or reconditioning the system. The present one may be largely aligned on the side of the status quo. The problem implicates our educational efforts which are bland and conformist and the pressures on the press, from political and from financial sources, to foist boilerplate points of view on our people rather than to display the diversities of ideologies and culture in a world which, as Buckminster Fuller said, has been "communized" by the radio.

What kind of First Amendment would best serve our needs as we approach the 21st century may be an open question. But the old-fashioned First Amendment that we have is the Court's only guideline; and one hard and fast principle which it announces is that Government

---

reporting the First Amendment is designed to promote and protect. As Senator McGee, Chairman of the Post Office and Civil Service Committee, has said: "I believe that the American public generally has a vested interest in the survival of newspapers and magazines. Regardless of the economic, political, or social policies which they espouse, they contribute to the nation's thought process. I am personally convinced that the Congress should not permit magazines to go under because the cost of distributing them through the postal system is higher than their readers are willing to pay." *Id.*, at 32.

In addition to the benefits of reduced postage rates, newspapers have been afforded a limited antitrust exemption. Newspaper Preservation Act, 15 U. S. C. § 1801 *et seq.*

shall keep its hands off the press. That principle has served us through days of calm and eras of strife and I would abide by it until a new First Amendment is adopted. That means, as I view it, that TV and radio, as well as the more conventional methods for disseminating news, are all included in the concept of "press" as used in the First Amendment and therefore are entitled to live under the laissez-faire regime which the First Amendment sanctions.

The issues presented in these cases are momentous ones. TV and radio broadcasters have mined millions by selling merchandise, not in selling ideas across the broad spectrum of the First Amendment. But some newspapers have done precisely the same, loading their pages with advertisements; they publish, not discussions of critical issues confronting our society, but stories about murders, scandal, and slanderous matter touching the lives of public servants who have no recourse due to *New York Times Co.* v. *Sullivan,* 376 U. S. 254. Commissioner Johnson of the FCC wrote in the present case a powerful dissent. He said:

> "Although the First Amendment would clearly ban governmental censorship of speech content, government must be concerned about the procedural rules that control the public forums for discussion. If someone—a moderator, or radio-television licensee—applies rules that give one speaker, or viewpoint, less time (or none at all) to present a position, then a censorship exists as invidious as outright thought control. There is little doubt in my mind that for any given forum of speech the First Amendment *demands* rules permitting as many to speak and be heard as possible. And if this Commission does not enact them, then the courts must require them." 25 F. C. C. 2d 216, 232.

But the prospect of putting Government in a position of control over publishers is to me an appalling one, even to the extent of the Fairness Doctrine. The struggle for liberty has been a struggle against Government. The essential scheme of our Constitution and Bill of Rights was to take Government off the backs of people. Separation of powers was one device. An independent judiciary was another device. The Bill of Rights was still another. And it is anathema to the First Amendment to allow Government any role of censorship over newspapers, magazines, books, art, music, TV, radio, or any other aspect of the press. There is unhappiness in some circles at the impotence of Government. But if there is to be a change, let it come by constitutional amendment. The Commission has an important role to play in curbing monopolistic practices, in keeping channels free from interference, in opening up new channels as technology develops. But it has no power of censorship.

It is said, of course, that Government can control the broadcasters because their channels are in the public domain in the sense that they use the airspace that is the common heritage of all the people. But parks are also in the public domain. Yet people who speak there do not come under Government censorship. *Lovell* v. *Griffin,* 303 U. S. 444, 450–453; *Hague* v. *CIO,* 307 U. S. 496; 515-516. It is the tradition of Hyde Park, not the tradition of the censor, that is reflected in the First Amendment. TV and radio broadcasters are a vital part of the press; and since the First Amendment allows no Government control over it, I would leave this segment of the press to its devices.

Licenses are, of course, restricted in time and while, in my view, Congress has the power to make each license limited to a fixed term and nonreviewable, there is no power to deny renewals for editorial or ideological rea-

sons. The reason is that the First Amendment gives no preference to one school of thought over others.[11]

The Court in today's decision by endorsing the Fairness Doctrine sanctions a federal saddle on broadcast licensees that is agreeable to the traditions of nations that never have known freedom of press [12] and that is tolerable in countries that do not have a written constitution containing prohibitions as absolute as those in the First Amendment. Indeed after these cases were argued the FCC instituted a "non-public" inquiry [13] to

---

[11] Judge Bazelon, dissenting in *Brandywine-Main Line Radio, Inc.* v. *FCC,* 153 U. S. App. D. C., at 358–359, 473 F. 2d, at 69–70, said:

"WXUR was no doubt devoted to a particular religious and political philosophy; but it was also a radio station devoted to speaking out and stirring debate on controversial issues. The station was purchased by Faith Theological Seminary to propagate a viewpoint which was not being heard in the greater Philadelphia area. The record is clear that through its interview and call-in shows it *did* offer a variety of opinions on a broad range of public issues; and that it never refused to lend its broadcast facilities to spokesmen of conflicting viewpoints.

"The Commission's strict rendering of fairness requirements, as developed in its decision, has removed WXUR from the air. This has deprived the listening public not only of a viewpoint but also of robust debate on innumerable controversial issues. It is beyond dispute that the public has *lost* access to information and ideas. This is not a loss to be taken lightly, however unpopular or disruptive we might judge these ideas to be." (Footnotes omitted.)

[12] If Eastern European experience since World War II is any criterion, the newspapers are pretty much the company paper in the huge company (Communist) nation. The easiest target, however, seems to be TV where the input can be carefully controlled and "prime time" filled with tapes of official meetings, political speeches, and the tedious accounts of achievement of the workers. See Morgan, Press Obedience in East Europe, Washington Post, May 19, 1973, p. A14.

[13] FCC Order No. 73–331, 39 Fed. Reg. 8301 (Mar. 27, 1973).

determine whether any broadcaster or cablecaster has broadcast " 'obscene, indecent or profane language' in violation of" 18 U. S. C. § 1464.

In April 1973, the FCC fined Sonderling Broadcasting Corp., which operates station WGLD in Oak Park, Illinois, for allowing "obscene" conversations on a telephone "talk show." It used *Roth* v. *United States,* 354 U. S. 476, *Memoirs* v. *Massachusetts,* 383 U. S. 413, and *Ginzburg* v. *United States,* 383 U. S. 463, as supplying the criteria for broadcasting. It fined the corporation $2,000 under 18 U. S. C. § 1464, which reads, "Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both."

Commissioner Johnson dissented, saying that the FCC prefers "to sit as an omniscient programming review board, allegedly capable of deciding what is and is not good for the American public to see and hear"; and that when the FCC bars a particular program it casts "a pall over the entire broadcasting industry" for the reason that the licensees "fear the potential loss of their highly profitable broadcast licenses." That, he concluded, creates a "chilling effect" which has "enormous proportions" and reaches "all forms of broadcast expression."

We ourselves have, of course, made great inroads on the First Amendment of which obscenity is only one of the many examples. So perhaps we are inching slowly toward a controlled press. But the regime of federal supervision under the Fairness Doctrine is contrary to our constitutional mandate and makes the broadcast licensee an easy victim of political pressures and reduces him to a timid and submissive segment of the press whose measure of the public interest will now be echoes of the dominant political voice that emerges after every election. The affair with freedom of which we have been

proud will now bear only a faint likeness of our former robust days.

## III

I said that it would come as a surprise to the public as well as to publishers and editors of newspapers to learn that they were under a newly created federal bureau. Perhaps I should have said that such an event *should* come as a surprise. In fact it might not in view of the retrogressive steps we have witnessed.

We have allowed ominous inroads to be made on the historic freedom of the newspapers. The effort to suppress the publication of the Pentagon Papers failed only by a narrow margin and actually succeeded for a brief spell in imposing prior restraint on our press for the first time in our history. See *New York Times Co.* v. *United States*, 403 U. S. 713.

In recent years the admonition of Mr. Justice Black that the First Amendment gave the press freedom so that it might "serve the governed, not the governors" (*id.*, at 717) has been disregarded.

"The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people and sending them off to distant lands to die of foreign fevers and foreign shot and shell." *Ibid.*

The right of the people to know has been greatly undermined by our decisions requiring, under pain of contempt, a reporter to disclose the sources of the information he comes across in investigative reporting. *Branzburg* v. *Hayes*, 408 U. S. 665.

The Boston Globe reports: [14]

> "In the last two years at least 20 Federal Grand Juries have been used to investigate radical or anti-war dissent. With the power of subpoena, the proceedings secret, and not bound by the rules of evidence required in open court, they have a lot more leverage than, for example, the old House Un-American Activities Committee."

Many reporters have been put in jail, a powerful weapon against investigative reporting. As the Boston Globe states, "in reality what is being undermined here is press freedom itself." [15]

In the same direction is the easy use of the stamp "secret" or "top secret" which the Court recently approved in *Environmental Protection Agency* v. *Mink*, 410 U. S. 73. That decision makes a shambles of the Freedom of Information Act. In tune with the other restraints on the press are provisions of the new proposed Rules of Evidence which the Court recently sent to Congress. Proposed Rule 509 (b) provides:

> "The government has a privilege to refuse to give evidence and to prevent any person from giving evidence upon a showing of reasonable likelihood of danger that the evidence will disclose a secret of state or official information, as defined in this rule."

Under the statute if Congress does not act,[16] this new regime of secrecy will be imposed on the Nation and the

---

[14] The People's Need to Know, Editorial Series, Jan. 21–27, 1973, reprinted from Boston Globe, p. 12.

[15] *Id.*, at 13.

[16] By reason of an Act of Congress of Mar. 30, 1973, the Rules of Evidence—and amendments to the Rules of Civil Procedure and to the Rules of Criminal Procedure (which we sent up Nov. 20, 1972, and Dec. 18, 1972)—will have no force or effect except to the extent that Congress expressly approves. 87 Stat. 9.

right of people to know will be further curtailed. The proposed code sedulously protects the Government; it does not protect newsmen. It indeed pointedly omits any mention of the privilege of newsmen to protect their confidential sources.

These growing restraints on newspapers have the same ominous message that the overtones of the present opinion have on TV and radio licensees.

The growing specter of governmental control and surveillance over all activities of people makes ominous the threat to liberty by those who hold the executive power. Over and over again, attempts have been made to use the Commission as a political weapon against the opposition, whether to the left or to the right.

Experience has shown that unrestrained power cannot be trusted to serve the public weal even though it be in governmental hands. The fate of the First Amendment should not be so jeopardized.[17] The constitutional mandate that the Government shall make "no law" abridging freedom of speech and the press is clear; the orders and rulings of the Commission are covered by that ban; and it must be carefully confined lest broadcasting—now our most powerful media—be used to subdue the minorities or help produce a Nation of people who walk submissively to the executive's notions of the public good.

---

[17] Alexander Bickel has spurned the "total agnosticism" that allows the First Amendment to have its way because "who really knows, after all, what is true or false, evil or good, noxious or wholesome." The Press and Government: Adversaries Without Absolutes, Freedom at Issue 5 (May-June 1973). He attributes this view to Mr. Justice Holmes. He would place at least partial responsibility with the Government for determining the "good counsels and wholesome doctrine." *Ibid.* But, it was precisely the mistrust of the evanescent, narrow, factional views of those in power and the belief that no one has a patent on the "truth" that underlay the First Amendment.

*Mills* v. *Alabama*, 384 U. S. 214, involved a prosecution of a newspaper editor for publishing, contrary to a state statute, an editorial on election day urging the voters to vote against the existing city commission and to replace it with a mayor-council government. This Court, speaking through Mr. Justice Black, reversed the judgment saying:

"[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve. Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change, which is all that this editorial did, muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free. The Alabama Corrupt Practices Act by providing criminal penalties for publishing editorials such as the one here silences the press at a time when it can be most effective. It is difficult to conceive of a more obvious and flagrant abridgment of the constitutionally guaranteed freedom of the press." *Id.*, at 219.

I would apply the same test to TV or radio.[18]

---

[18] The monetary and other burdens imposed on the press by the right of a criticized person to reply, like the traditional damage remedy for libel, lead of course to self-censorship respecting matters of importance to the public that the First Amendment denies the Government the power to impose. The burdens certainly are as onerous as the indirect restrictions on First Amendment rights which we have struck down: (1) the requirement that a bookseller examine the contents of his shop, *Smith* v. *California*, 361 U. S. 147 (1959); (2) the requirement that a magazine publisher investigate his advertisers, *Manual Enterprises, Inc.* v. *Day*, 370 U. S. 478, 492–493

What Walter Lippman wrote about President Coolidge's criticism of the press has present relevancy. Coolidge, he said, had

> " 'declared for peace, good-will, understanding moderation; disapproved of conquest, aggression, exploitation; pleaded for a patriotic press, for a free press; denounced a narrow and bigoted nationalism, and announced that he stood for law, order, protection of life, property, respect for sovereignty and principle of international law. Mr. Coolidge's catalog of the virtues was complete except for one virtue. . . . That is the humble realization that God has not endowed Calvin Coolidge with an infallible power to determine in each concrete case exactly what is right, what is just, what is patriotic. . . . Did he recognize this possibility he would not continue to lecture the press in such a way as to make it appear that when newspapers oppose him they are unpatriotic, and that when they support him they do so not because they think his case is good but because they blindly support him. Mr. Coolidge's notion . . . would if it were accepted by the American press reduce it to utter triviality.' " J. Luskin, Lippman, Liberty, and the Press 60 (1972).

(1962) (opinion of Harlan, J.); (3) the requirement that names and addresses of sponsors be printed on handbills, *Talley* v. *California*, 362. U. S. 60 (1960); (4) the requirement that organizations supply membership lists, *Gibson* v. *Florida Legislative Investigation Committee*, 372 U. S. 539 (1963); *Louisiana ex rel. Gremillion* v. *NAACP*, 366 U. S. 293 (1961); *Bates* v. *City of Little Rock*, 361 U. S. 516 (1960); *NAACP* v. *Alabama*, 357 U. S. 449 (1958); and (5) the requirement that individuals disclose organizational membership, *Shelton* v. *Tucker*, 364 U. S. 479 (1960). In each instance we held the restriction unconstitutional on the ground that it discouraged or chilled constitutionally protected rights of speech, press, or association.

The same political appetite for oversight of most segments of the press has markedly increased since the bland days of Calvin Coolidge.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL concurs, dissenting.

These cases require us to consider whether radio and television broadcast licensees may, with the approval of the Federal Communications Commission,[1] refuse *absolutely* to sell any part of their advertising time to groups or individuals wishing to speak out on controversial issues of public importance.   In practical effect, the broadcaster policy here under attack permits airing of only those paid presentations which advertise products or deal with "non-controversial" matters, while relegating the discussion of controversial public issues to formats such as documentaries, the news, or panel shows, which are tightly controlled and edited by the broadcaster.   The Court holds today that this policy—including the *absolute* ban on the sale of air time for the discussion of controversial issues—is consistent with the "public interest" requirements of the Communications Act of 1934, 47 U. S. C. §§ 307 (d), 309 (a).[2]   The Court also holds that the

---

[1] See *Business Executives Move for Vietnam Peace,* 25 F. C. C. 2d 242 (1970); *Democratic National Committee,* 25 F. C. C. 2d 216 (1970).

[2] I do not *specifically* address the "statutory" question in this case because, in practical effect, the considerations underlying the "statutory" question are in many respects similar to those relevant to the "substance" of the "constitutional" claim.   There is one aspect of the Court's "statutory" discussion, however, that merits at least brief attention.   In upholding the absolute ban on the sale of editorial advertising, the Court relies heavily upon 47 U. S. C. § 153 (h), which declares that broadcasters shall not be deemed "common carriers."   In my view, this reliance is misplaced. Even a cursory examination of the legislative history of this provision reveals that it was enacted in recognition of the fact that

challenged policy does not violate the First Amendment. It is noteworthy that, in reaching this result, the Court does *not* hold that there is insufficient "governmental involvement" in the promulgation and enforcement of the challenged ban to activate the commands of the First Amendment. On the contrary, only THE CHIEF JUSTICE, and my Brothers STEWART and REHNQUIST express the view that the First Amendment is inapplicable to this case. My Brothers WHITE, BLACKMUN, and POWELL quite properly do not decide that question, for they find that the broadcaster policy here under attack does not violate the "substance" of the First Amendment. Similarly, there is no majority for the *holding* that the challenged ban does not violate the "substance" of the First Amendment. For, although THE CHIEF JUSTICE, and my Brother REHNQUIST purport to "decide" that question, their disposition of the "governmental involvement" issue necessarily renders their subsequent discussion of the "substantive" question mere dictum.

---

traditional doctrines governing true "common carriers," such as transportation companies, would not suit the particular problems of radio broadcasting. Specifically, it was feared that such "common carrier" status for broadcasters would mean that they "would have to give *all* their time to [public issues]." 67 Cong. Rec. 12504 (Sen. Dill) (emphasis added); see also *ibid.* (Sen. Broussard); *id.,* at 12356 (Sen. Fess). Section 153 (h) was intended solely to assure that broadcasters would not be required to surrender *all* of their air time to willing purchasers; it does not bear upon the question whether they may be required to sell a *reasonable and limited* amount of air time to members of the public for discussion of controversial issues. See 2 Z. Chafee, Government and Mass Communications 635 n. 75 (1947). Indeed, the Commission itself has rejected the Court's interpretation of § 153 (h) when it declared, over 25 years ago, that "the operation of any station under the extreme principles that no time shall be sold for the discussion of controversial public issues . . . is inconsistent with the concept of public interest established by the Communications Act. . . ." *United Broadcasting Co.,* 10 F. C. C. 515, 518 (1945).

In my view, the principle at stake here is one of fundamental importance, for it concerns the people's right to engage in and to hear vigorous public debate on the broadcast media. And balancing what I perceive to be the competing interests of broadcasters, the listening and viewing public, and individuals seeking to express their views over the electronic media, I can only conclude that the exclusionary policy upheld today can serve only to inhibit, rather than to further, our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964). I would therefore affirm the determination of the Court of Appeals that the challenged broadcaster policy is violative of the First Amendment.

I

The command of the First Amendment that "Congress shall make no law . . . abridging the freedom of speech, or of the press" is, on its face, directed at governmental rather than private action. Nevertheless, our prior decisions make clear that "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon [governmental] action." *Evans* v. *Newton,* 382 U. S. 296, 299 (1966). Thus, the reach of the First Amendment depends not upon any formalistic "private-public" dichotomy but, rather, upon more functional considerations concerning the extent of governmental involvement in, and public character of, a particular "private" enterprise. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the [Government] in private conduct be attributed its true significance." *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 722 (1961); see *Moose Lodge No. 107* v.

*Irvis,* 407 U. S. 163, 172 (1972). And because of the inherent complexity of this case-by-case inquiry, "[t]his Court has never attempted the 'impossible task' of formulating an infallible test" for determining in all instances whether particular conduct must be deemed private or governmental. *Reitman* v. *Mulkey,* 387 U. S. 369, 378 (1967); see *Kotch* v. *Pilot Comm'rs,* 330 U. S. 552, 556 (1947).

This does not mean, of course, that our prior experience in this area offers no guidance for the purposes of our present inquiry. On the contrary, our previous decisions have focused on myriad indicia of "governmental action," many of which are directly applicable to the operations of the broadcast industry.[3] As the Court of Appeals recognized, "the general characteristics of the broadcast industry reveal an extraordinary relationship between the broadcasters and the federal government— a relationship which puts that industry in a class with few others." 146 U. S. App. D. C. 181, 190, 450 F. 2d 642, 651. More specifically, the public nature of the airwaves, the governmentally created preferred status of broadcast licensees, the pervasive federal regulation of broadcast programming, and the Commission's specific approval of the challenged broadcaster policy combine in this case to bring the promulgation and enforcement of that policy within the orbit of constitutional imperatives.

At the outset, it should be noted that both radio and television broadcasting utilize a natural resource—the electromagnetic spectrum[4]—that is part of the public

---

[3] See generally *Business Executives Move for Vietnam Peace,* 25 F. C. C. 2d, at 253–264 (dissenting opinion), wherein Commissioner Johnson identified no less than eight separate indicia of "governmental action" involved in the promulgation and enforcement of the challenged broadcaster policy.

[4] For a discussion of the attributes of the electromagnetic spectrum, see generally W. Jones, Regulated Industries 1019 (1967); Levin, The Radio Spectrum Resource, 11 J. Law & Econ. 433 (1968).

domain. And, although broadcasters are granted the temporary use of this valuable resource for terminable three-year periods, "ownership" and ultimate control remain vested in the people of the United States. Thus, § 301 of the Communications Act of 1934, 47 U. S. C. § 301, specifically provides:

> "It is the purpose of this [Act] . . . to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. . . ."

Such public "ownership" of an essential element in the operations of a private enterprise is, of course, an important and established indicium of "governmental involvement." In *Burton* v. *Wilmington Parking Authority, supra,* for example, we emphasized the fact of "public ownership" in holding the proscriptions of the Fourteenth Amendment applicable to a privately owned restaurant leasing space in a building owned by the State.[5]

---

[5] It is true, of course, that unlike the State in *Burton,* the Federal Government here does not receive substantial financial compensation for the use of the "public" property. See *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 723–724 (1961); *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 174–175 (1972). Nevertheless, the absence of such a financial arrangement represents, in practical effect, Government subsidization of broadcasters, thereby enhancing the degree of governmental involvement. Cf. Kalven, Broadcasting, Public Policy and the First Amendment, 10 J. Law & Econ. 15, 31 (1967). Moreover, as in *Burton,* the publicly owned property is "not surplus state property" but, rather, constitutes an "integral and, indeed, indispensable part" of the governmental scheme. *Burton* v. *Wilmington Parking Authority, supra,* at 723. See also 47 U. S. C. § 303 (g).

In reaching that result, we explained that, in part because of the "public ownership" of the building, the State "has elected to place its power, property and prestige behind the" actions of the privately owned restaurant. 365 U. S., at 725. And, viewing the relationship in its entirety, we concluded that "[t]he State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity. . . ." *Ibid.;* see also *Moose Lodge No. 107* v. *Irvis, supra,* at 172–173, 175; *Turner* v. *City of Memphis,* 369 U. S. 350 (1962); *Kissinger* v. *New York City Transit Authority,* 274 F. Supp. 438 (SDNY 1967); *Farmer* v. *Moses,* 232 F. Supp. 154 (SDNY 1964).

A second indicium of "governmental involvement" derives from the direct dependence of broadcasters upon the Federal Government for their "right" to operate broadcast frequencies. There can be no doubt that, for the industry as a whole, governmental regulation alone makes "radio communication possible by . . . limiting the number of licenses so as not to overcrowd the spectrum." *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 389 (1969).[6] Moreover, with respect to individual licensees, it is equally clear that "existing broadcasters have often attained their present position," not as a result of free market pressures [7] but, rather, "because of their initial government selection. . . ." *Id.,* at 400. Indeed, the "quasi-monopolistic" advantages enjoyed by broadcast licensees "are the fruit of a preferred position conferred by the Government." *Ibid.*

---

[6] For a discussion of the Fairness Doctrine and its relevance to this case, see text and notes, at nn. 15–34, *infra.*

[7] Indeed, the Communications Act of 1934 makes it a criminal offense to operate a broadcast transmitter without a license. See 47 U. S. C. § 501. Thus, the Federal Government specifically insulates the licensee from any real threat of economic competition.

Thus, as Mr. Chief Justice (then Judge) Burger has himself recognized, "[a] broadcaster seeks and is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations." *Office of Communication of United Church of Christ* v. *FCC,* 123 U. S. App. D. C. 328, 337, 359 F. 2d 994, 1003 (1966). And, along these same lines, we have consistently held that "when authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself." *American Communications Assn.* v. *Douds,* 339 U. S. 382, 401 (1950); see, *e. g., Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 462 n. 8 (1952).

A further indicium of "governmental involvement" in the promulgation and enforcement of the challenged broadcaster policy may be seen in the extensive governmental control over the broadcast industry. It is true, of course, that this "Court has never held" that actions of an otherwise private entity necessarily constitute governmental action if that entity "is subject to . . . regulation in any degree whatever." *Moose Lodge No. 107* v. *Irvis, supra,* at 173. Here, however, we are confronted, not with some minimal degree of regulation, but, rather, with an elaborate statutory scheme governing virtually all aspects of the broadcast industry.[8] Indeed, federal

---

[8] Thus, the Communications Act of 1934 authorizes the Federal Communications Commission to assign frequency bands, 47 U. S. C. § 303 (c); allocate licenses by location, § 303 (d); regulate apparatus, § 303 (e); establish service areas, § 303 (h); regulate chain ownership, § 303 (i); require the keeping of detailed records, § 303 (j); establish qualifications of licensees, § 303 (l); suspend licenses, § 303 (m)(1); inspect station facilities, § 303 (n); require publication of call letters and other information, § 303 (p); make rules to effect regulation of radio and television, § 303 (r); require that television sets be capable of receiving all signals, § 303 (s); regulate

agency review and guidance of broadcaster conduct is automatic, continuing, and pervasive.[9] Thus, as the Court of Appeals noted, "[a]lmost no other private business—almost no other regulated private business—is so intimately bound to government . . . ." 146 U. S. App. D. C., at 191, 450 F. 2d, at 652.

Even more important than this general regulatory scheme, however, is the *specific* governmental involvement in the broadcaster policy presently under consideration. There is, for example, an obvious nexus between the Commission's Fairness Doctrine and the absolute refusal of broadcast licensees to sell any part of their air time to groups or individuals wishing to speak out on controversial issues of public importance. Indeed, in defense of this policy, the broadcaster-petitioners argue vigorously that this exclusionary policy is authorized and even compelled by the Fairness Doctrine. And the Court itself recognizes repeatedly that the Fairness Doctrine and other Communications Act policies are

---

the granting of licenses and the terms thereof, §§ 307, 309; prescribe information to be supplied by applicants for licenses, § 308 (b); regulate the transfer of licenses, § 310; impose sanctions on licensees, including revocation of license, § 312; require fair coverage of controversial issues, § 315; control the operation of transmitting apparatus, § 318; and prohibit the use of offensive language, 18 U. S. C. § 1464.

[9] Pursuant to statutory authority, see n. 8, *supra*, the Commission has promulgated myriad regulations governing all aspects of licensee conduct. See 47 CFR § 73.17 *et seq.* These regulations affect such matters as hours of operation, § 73.23; multiple ownership of licenses by a single individual, § 73.35; station location and program origination, § 73.30; maintenance of detailed logs of programming, operation, and maintenance, §§ 73.111–116; billing practices, § 73.124; the personal attack and political editorial fairness requirements, § 73.123; relationship of licensees to networks, §§ 73.131–139; permissible equipment, §§ 73.39–50. The above-cited regulations relate only to AM radio, but similar regulations exist for FM radio, § 73.201 *et seq.*, and television, § 73.601 *et seq.*

inextricably linked to the challenged ban. Thus, at one point, the Court suggests that "[i]f the Fairness Doctrine were applied to editorial advertising, there is . . . the substantial danger that the effective operation of that doctrine would be jeopardized." *Ante,* at 124. Similarly, the Court maintains that, in light of the Fairness Doctrine, there simply is no reason to allow individuals to purchase advertising time for the expression of their own views on public issues. See *ante,* at 130–131.[10] Although I do not in any sense agree with the substance of these propositions, they serve at least to illustrate the extent to which the Commission's Fairness Doctrine has influenced the development of the policy here under review.

Moreover, the Commission's involvement in the challenged policy is not limited solely to the indirect effects of its Fairness Doctrine. On the contrary, in a decision which must inevitably provide guidance for future broadcaster action, the Commission has specifically considered and specifically authorized the flat ban. See *Business Executives Move for Vietnam Peace,* 25 F. C. C. 2d 242 (1970); *Democratic National Committee,* 25 F. C. C. 2d 216 (1970). In so doing, the Commission— and through it the Federal Government—has unequivocally given its imprimatur to the absolute ban on editorial advertising. And, of course, it is now well settled that specific governmental approval of or acquiescence in challenged action by a private entity indicates "governmental action."

Thus, in *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151 (1914), for example, the Court dealt with a statute which, as construed by the Court, simply

---

[10] In addition, the Court contends that, because of the Fairness Doctrine, the challenged broadcaster policy does not discriminate against controversial speech. See *ante,* at 128–130.

*authorized* rail carriers to provide certain types of cars for white passengers without offering equal facilities to blacks. Although dismissal of the complaint on procedural grounds was affirmed, we made clear that such a statute, even though purely permissive in nature, was invalid under the Fourteenth Amendment because a carrier refusing equal service to blacks would be "acting in the matter under the authority of a state law." *Id.*, at 162. And, some 50 years later, we explained this finding of "governmental action" in *McCabe* as "nothing less than considering a permissive state statute as an authorization to discriminate and as sufficient state action to violate the Fourteenth Amendment. . . ." *Reitman* v. *Mulkey*, 387 U. S., at 379. Thus, "[o]ur prior decisions leave no doubt" that any action of the Government, through any of its agencies, approving, authorizing, encouraging, or otherwise supporting conduct which, if performed by the Government, would violate the Constitution, "constitutes illegal [governmental] involvement in those pertinent private acts . . . that subsequently occur." *Adickes* v. *Kress & Co.*, 398 U. S. 144, 202 (1970) (opinion of BRENNAN, J.); see, *e. g., Moose Lodge No. 107* v. *Irvis, supra; Hunter* v. *Erickson*, 393 U. S. 385 (1969); *Reitman* v. *Mulkey, supra; Evans* v. *Newton*, 382 U. S. 296 (1966); *Robinson* v. *Florida*, 378 U. S. 153 (1964); *Lombard* v. *Louisiana*, 373 U. S. 267 (1963); *Peterson* v. *City of Greenville*, 373 U. S. 244 (1963); *Burton* v. *Wilmington Parking Authority, supra; McCabe* v. *Atchison, T. & S. F. R. Co., supra.*

Finally, and perhaps most important, in a case virtually identical to those now before us, we held that a policy promulgated by a privately owned bus company, franchised by the Federal Government and regulated by the Public Utilities Commission of the District of Columbia, must be subjected to the constraints of the First Amendment. *Public Utilities Comm'n* v. *Pollak*, 343

U. S. 451 (1952). In reaching that result, we placed primary emphasis on the specific regulatory acquiescence in the challenged action of the bus company. Thus, after noting that the bus company "operates its service under the regulatory supervision of the Public Utilities Commission of the District of Columbia which is an agency authorized by Congress," we explained that our finding of "governmental action" was predicated specifically

> "upon the fact that that agency, pursuant to protests against the [challenged policy], ordered an investigation of it and, after formal public hearings, ordered its investigation dismissed on the ground that the public safety, comfort and convenience were not impaired thereby." *Id.,* at 462.

See *Moose Lodge No. 107* v. *Irvis, supra,* at 175–176, n. 3.

Although THE CHIEF JUSTICE, joined by MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST, strains valiantly to distinguish *Pollak,* he offers nothing more than the proverbial "distinctions without a difference." Here, as in *Pollak,* the broadcast licensees operate "under the regulatory supervision of . . . an agency authorized by Congress." 343 U. S., at 462. And, again as in *Pollak,* that agency received "protests" against the challenged policy and, after formal consideration, "dismissed" the complaints on the ground that the "public interest, convenience, and necessity" were not "impaired" by that policy. Indeed, the argument for finding "governmental action" here is even stronger than in *Pollak,* for this case concerns, not an incidental activity of a bus company, but, rather, the primary activity of the regulated entities—communication.

Thus, given the confluence of these various indicia of "governmental action"—including the public nature

of the airwaves,[11] the governmentally created preferred status of broadcasters, the extensive Government regulation of broadcast programming, and the specific governmental approval of the challenged policy—I can only conclude that the Government "has so far insinuated itself into a position" of participation in this policy that the absolute refusal of broadcast licensees to sell air time to groups or individuals wishing to speak out on controversial issues of public importance must be subjected to the restraints of the First Amendment.[12]

---

[11] Moreover, the appropriateness of a particular forum, even if privately owned, for effective communication has in some instances been emphasized to establish the relevance of First Amendment protections. See, e. g., *Amalgamated Food Employees Union* v. *Logan Valley Plaza*, 391 U. S. 308 (1968); *Marsh* v. *Alabama*, 326 U. S. 501 (1946). Here, as the Court of Appeals recognized, "the broadcast media are specifically dedicated to communication. They function as both our foremost forum for public speech and our most important educator of an informed people." 146 U. S. App. D. C. 181, 192, 450 F. 2d 642, 653. See also text and notes, at nn. 35–37, *infra*.

[12] In his concurring opinion, my Brother STEWART suggests that a finding of governmental action in this context necessarily means that "private broadcasters *are* Government." *Ante*, at 139 (emphasis in original). In my view, this assertion reflects a complete misunderstanding of the nature of the governmental involvement in these cases. Here, the Government has selected the persons who will be permitted to operate a broadcast station, extensively regulates those broadcasters, and has specifically approved the challenged broadcaster policy. Thus, the commands of the First Amendment come into play, not because "private broadcasters *are* Government," but, rather, because the Government "has so far insinuated itself into a position" of participation in the challenged policy as to make the Government itself responsible for its effects. Similarly, I cannot agree with my Brother STEWART's suggestion that a finding of governmental involvement here "would . . . simply strip broadcasters of their own First Amendment rights." *Ibid.* The actions of a purely private individual are, of course, not subject to the constraints of the First Amendment. But where, as here, the

## II

Radio and television have long been recognized as forms of communication "affected by a First Amendment interest" and, indeed, it can hardly be doubted that broadcast licensees are themselves protected by that Amendment. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S., at 386. See *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 166 (1948); Z. Chafee, Free Speech in the United States 545–546 (1941). Recognition of this fact does not end our inquiry, however, for it is equally clear that the protection of the First Amendment in this context is not limited solely to broadcasters. On the contrary, at least one set of competing claims to the

---

Government has implicated itself in the actions of an otherwise private individual, that individual must exercise his own rights with due regard for the First Amendment rights of others. In other words, an accommodation of competing rights is required, and "balancing," not the "absolutist" approach suggested by my Brother STEWART, is the result. Indeed, it is this misunderstanding of the significance of governmental involvement that apparently leads to my Brother STEWART's disagreement with my Brothers WHITE, BLACKMUN, and POWELL as to the relationship between the "public interest" standard of the Act and First Amendment "values."

I might also note that, contrary to the suggestion of my Brother STEWART, a finding of governmental involvement in this case does not in any sense command a similar conclusion with respect to newspapers. Indeed, the factors that compel the conclusion that the Government is involved in the promulgation and enforcement of the challenged broadcaster policy have simply no relevance to newspapers. The decision as to who shall operate newspapers is made in the free market, not by Government fiat. The newspaper industry is not extensively regulated and, indeed, in light of the differences between the electronic and printed media, such regulation would violate the First Amendment with respect to newspapers. Finally, since such regulation of newspapers would be impossible, it would likewise be impossible for the Government to approve an exclusionary policy of newspapers in the sense that it has approved the challenged policy of the broadcasters.

protection of that Amendment derives from the fact that, because of the limited number of broadcast frequencies available and the potentially pervasive impact of the electronic media, "the people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment." *Red Lion Broadcasting Co.* v. *FCC, supra,* at 390.

Over 50 years ago, Mr. Justice Holmes sounded what has since become a dominant theme in applying the First Amendment to the changing problems of our Nation. "[T]he ultimate good," he declared, "is better reached by free trade in ideas," and "the best test of truth is the power of the thought to get itself accepted in the competition of the market . . . ." *Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (dissenting opinion); see also *Whitney* v. *California,* 274 U. S. 357, 375–376 (1927) (Brandeis, J., concurring); *Gitlow* v. *New York,* 268 U. S. 652, 672–673 (1925) (Holmes, J., dissenting). Indeed, the First Amendment itself testifies to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," [13] and the Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public . . . ." *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945). For "it is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected." *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949); see also *Thornhill* v. *Alabama,* 310 U. S. 88, 102 (1940); *Palko* v. *Connecticut,* 302 U. S. 319, 326–327 (1937).

---

[13] *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964); see also *Pickering* v. *Board of Education,* 391 U. S. 563, 573 (1968); *Mills* v. *Alabama,* 384 U. S. 214, 218 (1966).

With considerations such as these in mind, we have specifically declared that, in the context of radio and television broadcasting, the First Amendment protects "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences . . . ." *Red Lion Broadcasting Co. v. FCC, supra,* at 390.[14]  And, because "[i]t is the purpose of the First Amendment to preserve an uninhibited market-place of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee," "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Ibid.*

Thus, we have explicitly recognized that, in light of the unique nature of the electronic media, the public have strong First Amendment interests in the reception of a full spectrum of views—presented in a vigorous and uninhibited manner—on controversial issues of public importance.  And, as we have seen, it has traditionally been thought that the most effective way to insure this "uninhibited, robust, and wide-open" debate is by fostering a "free trade in ideas" by making our forums of communication readily available to all persons wishing to express their views.  Although apparently conceding the legitimacy of these principles, the Court nevertheless upholds the absolute ban on editorial advertising because, in its view, the Commission's Fairness Doctrine, in and of itself, is sufficient to satisfy the First Amendment interests of the public.  I cannot agree.

---

[14] This was not new doctrine, for we have long recognized in a variety of contexts that the First Amendment "necessarily protects the right to receive [information]." *Martin v. City of Struthers,* 319 U. S. 141, 143 (1943); see, *e. g., Stanley v. Georgia,* 394 U. S. 557, 564 (1969); *Time, Inc. v. Hill,* 385 U. S. 374, 388 (1967); *Griswold v. Connecticut,* 381 U. S. 479, 482 (1965); *Lamont v. Postmaster General,* 381 U. S. 301 (1965).

The Fairness Doctrine originated early in the history of broadcast regulation and, rather than being set forth in any specific statutory provision,[15] developed gradually in a long series of Commission rulings in particular cases.[16] In essence, the doctrine imposes a twofold duty upon broadcast licensees: (1) coverage of issues of public importance must be adequate,[17] and (2) such coverage must fairly reflect opposing viewpoints.[18] See *Red Lion Broadcasting Co.* v. *FCC, supra,* at 377. In fulfilling their obligations under the Fairness Doctrine,

---

[15] The Fairness Doctrine was recognized and implicitly approved by Congress in the 1959 amendments to § 315 of the Communications Act. Act of Sept. 14, 1959, § 1, 73 Stat. 557, 47 U. S. C. § 315 (a). As amended, § 315 (a) recognizes the obligation of broadcasters "to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance."

[16] The Fairness Doctrine was first fully set forth in Report in the Matter of Editorializing by Broadcast Licensees, 13 F. C. C. 1246 (1949), and was elaborated upon in Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 Fed. Reg. 10415 (1964). The statutory authority of the Commission to promulgate this doctrine and related regulations derives from the mandate to the "Commission from time to time, as public convenience, interest, or necessity requires," to promulgate "such rules and regulations and prescribe such restrictions and conditions . . . as may be necessary to carry out the provisions of [the Act]. . . ." 47 U. S. C. § 303 (r).

[17] See *John J. Dempsey,* 6 P & F Radio Reg. 615 (1950); see also *Metropolitan Broadcasting Corp.,* 19 P & F Radio Reg. 602 (1960); *The Evening News Assn.,* 6 P & F Radio Reg. 283 (1950).

[18] If the broadcaster presents one side of a question, and does not wish to present the other side himself, he can fulfill his fairness obligation by announcing his willingness to broadcast opposing views by volunteers. See *Mid-Florida Television Corp.,* 40 F. C. C. 620 (1964). If the broadcaster rejects a volunteer spokesman as "inappropriate," he must seek out others. See *Richard G. Ruff,* 19 F. C. C. 2d 838 (1969). The broadcaster must provide free time for the presentation of opposing views if sponsorship is unavailable. See *Cullman Broadcasting Co.,* 25 P & F Radio Reg. 895 (1963).

however, broadcast licensees have virtually complete discretion, subject only to the Commission's general requirement that licensees act "reasonably and in good faith," [19] "to determine what issues should be covered, how much time should be allocated, which spokesmen should appear, and in what format." [20]  Thus, the Fairness Doctrine does not in any sense require broadcasters to allow "non-broadcaster" speakers to use the airwaves to express their own views on controversial issues of public importance.[21]  On the contrary, broadcasters may meet

---

[19] Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, *supra,* n. 16, at 10424.

[20] Notice of Inquiry: The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 30 F. C. C. 2d 26, 27–28 (1971); see also Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, *supra,* n. 16, at 10416; Report in the Matter of Editorializing by Broadcast Licensees, *supra,* n. 16.

[21] Thus, the Fairness Doctrine must be sharply distinguished from the "equal time" requirement, which provides that a broadcaster who affords air time to one political candidate must make equal time available to other candidates for the same office.  47 U. S. C. § 315.  See also *Nicholas Zapple,* 23 F. C. C. 2d 707 (1970) (extension of "equal time" rule to cover a candidate's supporters where spokesmen for other candidates are permitted to purchase air time).  Similarly, the Fairness Doctrine must not be confused with the Commission's "personal attack" and "political editorializing" rules which were upheld in *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969).  The "personal attack" rule provides that "[w]hen, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person," the licensee must notify the person attacked and offer him an opportunity to respond.  47 CFR § 73.123. The "political editorializing" rule provides that when a licensee endorses a candidate for political office it must give other candidates or their spokesmen an opportunity to respond.  See, *e. g.,* 47 CFR § 73.123.  Thus, unlike the Fairness Doctrine, the "equal time," "personal attack," and "political editorializing" rules grant a particular group or individual a limited "right of access" to the airwaves not subject to the "journalistic supervision" of the broadcaster.

their fairness responsibilities through presentation of carefully edited news programs, panel discussions, interviews, and documentaries.   As a result, broadcasters retain almost exclusive control over the selection of issues and viewpoints to be covered, the manner of presentation, and, perhaps most important, who shall speak.   Given this doctrinal framework, I can only conclude that the Fairness Doctrine, standing alone, is insufficient—in theory as well as in practice—to provide the kind of "uninhibited, robust, and wide-open" exchange of views to which the public is constitutionally entitled.

As a practical matter, the Court's reliance on the Fairness Doctrine as an "adequate" alternative to editorial advertising seriously overestimates the ability—or willingness—of broadcasters to expose the public to the "widest possible dissemination of information from diverse and antagonistic sources." [22]   As Professor Jaffe has noted, "there is considerable possibility the broadcaster will exercise a large amount of self-censorship and try to avoid as much controversy as he safely can." [23] Indeed, in light of the strong interest of broadcasters in maximizing their audience, and therefore their profits, it seems almost naive to expect the majority of broadcasters to produce the variety and controversiality of material necessary to reflect a full spectrum of viewpoints.   Stated simply, angry customers are not good customers and, in the commercial world of mass communications, it is simply "bad business" to espouse— or even to allow others to espouse—the heterodox or the controversial.   As a result, even under the Fairness Doctrine, broadcasters generally tend to permit only estab-

---

[22] *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945).

[23] Jaffe, The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access, 85 Harv. L. Rev. 768, 773 n. 26 (1972).

188

lished—or at least moderated—views to enter the broadcast world's "marketplace of ideas." [24]

Moreover, the Court's reliance on the Fairness Doctrine as the *sole* means of informing the public seriously misconceives and underestimates the public's

[24] See generally D. Lacy, Freedom and Communications 69 (1961); Mallamud, The Broadcast Licensee as Fiduciary: Toward the Enforcement of Discretion, 1973 Duke L. J. 89, 94–95, 98–99; Jaffe, *supra,* n. 23, at 773 n. 26; Canby, The First Amendment Right to Persuade: Access to Radio and Television, 19 U. C. L. A. L. Rev. 723, 727 (1972); Malone, Broadcasting, The Reluctant Dragon: Will the First Amendment Right of Access End the Suppressing of Controversial Ideas?, 5 U. Mich. J. L. Reform 193, 205–211, 216 (1972); Johnson & Westen, A Twentieth Century Soapbox: The Right to Purchase Radio and Television Time, 57 Va. L. Rev. 574 (1971); Barron, Access to the Press—A New First Amendment Right, 80 Harv. L. Rev. 1641 (1967); Note, Free Speech and the Mass Media, 57 Va. L. Rev. 636 (1971); Note, A Fair Break for Controversial Speakers: Limitations of the Fairness Doctrine and the Need for Individual Access, 39 Geo. Wash. L. Rev. 532 (1971); Note, The Wasteland Revisited: A Modest Attack Upon the FCC's Category System, 17 U. C. L. A. L. Rev. 868, 870–875 (1970); Comment, Freedom of Speech and the Individual's Right of Access to the Airwaves, 1970 Law & Social Order 424, 428; Note, The Federal Communications Commission's Fairness Regulations: A First Step Towards Creation of a Right of Access to the Mass Media, 54 Cornell L. Rev. 294, 296 (1969).

Although admitting that the Fairness Doctrine "has not always brought to the public perfect or, indeed, even consistently high-quality treatment of all public events and issues," the Court nevertheless suggests that a broadcaster who fails to fulfill his fairness obligations does so "at the risk of losing his license." *Ante,* at 130–131. The Court does not cite a single instance, however, in which this sanction has ever been invoked because of a broadcaster's failure to comply with the Fairness Doctrine. Indeed, this is not surprising, for the Commission has acted with great reluctance in this area, intervening in only the most extreme cases of broadcaster abuse. See Mallamud, *supra,* at 115–122; Canby, *supra,* at 725–727; Malone, *supra,* at 215–216; see also Cox & Johnson, Broadcasting in America and the FCC's License Renewal Process: An Oklahoma Case Study, 14 F. C. C. 2d 1 (1968).

interest in receiving ideas and information directly from the advocates of those ideas without the interposition of journalistic middlemen. Under the Fairness Doctrine, broadcasters decide what issues are "important," how "fully" to cover them, and what format, time, and style of coverage are "appropriate." The retention of such *absolute* control in the hands of a few Government licensees is inimical to the First Amendment, for vigorous, free debate can be attained only when members of the public have at least *some* opportunity to take the initiative and editorial control into their own hands.

Our legal system reflects a belief that truth is best illuminated by a collision of genuine advocates. Under the Fairness Doctrine, however, accompanied by an absolute ban on editorial advertising, the public is compelled to rely *exclusively* on the "journalistic discretion" of broadcasters, who serve in theory as surrogate spokesmen for all sides of all issues. This separation of the advocate from the expression of his views can serve only to diminish the effectiveness of that expression. Indeed, we emphasized this fact in *Red Lion:* [25]

> "Nor is it enough that he should hear the arguments of adversaries from his own teachers, presented as they state them, and accompanied by what they offer as refutations. That is not the way to do justice to the arguments, or bring them into real contact with his own mind. He must be able to hear them from persons who actually believe them; who defend them in earnest, and do their very utmost for them."

Thus, if the public is to be honestly and forthrightly apprised of opposing views on controversial issues, it is imperative that citizens be permitted at least *some*

---

[25] *Red Lion Broadcasting Co.* v. *FCC, supra,* at 392 n. 18, quoting J. Mill, On Liberty 32 (R. McCallum ed. 1947).

opportunity to speak directly for themselves as genuine advocates on issues that concern them.

Moreover, to the extent that broadcasters actually permit citizens to appear on "their" airwaves under the Fairness Doctrine, such appearances are subject to extensive editorial control. Yet it is clear that the effectiveness of an individual's expression of his views is as dependent on the style and format of presentation as it is on the content itself. And the relegation of an individual's views to such tightly controlled formats as the news, documentaries, edited interviews, or panel discussions may tend to minimize, rather than maximize the effectiveness of speech. Under a limited scheme of editorial advertising, however, the crucial editorial controls are in the speaker's own hands.

Nor are these cases concerned solely with the adequacy of coverage of those views and issues which generally are recognized as "newsworthy." For also at stake is the right of the public to receive suitable access to new and generally unperceived ideas and opinions. Under the Fairness Doctrine, the broadcaster is required to present only *"representative* community views and voices on controversial issues" of public importance.[26] Thus, by definition, the Fairness Doctrine tends to perpetuate coverage of those "views and voices" that are already established, while failing to provide for exposure of the public to those "views and voices" that are novel, unorthodox, or unrepresentative of prevailing opinion.[27]

---

[26] *Democratic National Committee,* 25 F. C. C. 2d, at 222 (emphasis added).

[27] Indeed, the failure to provide adequate means for groups and individuals to bring new issues or ideas to the attention of the public explains, at least to some extent, "the development of new media to convey unorthodox, unpopular, and new ideas. Sit-ins and demonstrations testify to . . . the inability to secure access to the conventional means of reaching and changing public opinion. [For by]

Finally, it should be noted that the Fairness Doctrine permits, indeed *requires*, broadcasters to determine for themselves which views and issues are sufficiently "important" to warrant discussion. The briefs of the broadcaster-petitioners in this case illustrate the type of "journalistic discretion" licensees now exercise in this regard. Thus, ABC suggests that it would refuse to air those views which *it* considers "scandalous" or "crackpot," [28] while CBS would exclude those issues or opinions that are "insignificant" [29] or "trivial." [30] Similarly, NBC would bar speech that strays "beyond the bounds of normally accepted taste," [31] and WTOP would protect the public from subjects that are "slight, parochial or inappropriate." [32]

The genius of the First Amendment, however, is that it has always defined what the public ought to hear by permitting speakers to say what they wish. As the Court of Appeals recognized, "[i]t has traditionally been thought that the best judge of the importance of a particular viewpoint or issue is the individual or group holding the viewpoint and wishing to communicate it to others." 146 U. S. App. D. C., at 195, 450 F. 2d, at 656. Indeed, "supervised and ordained discussion" is directly contrary to the underlying purposes of the First Amendment,[33] for that Amendment "presupposes that right

---

the bizarre and unsettling nature of his technique, the demonstrator hopes to arrest and divert attention long enough to compel the public to ponder his message." Barron, 80 Harv. L. Rev., at 1647; cf. *Adderley* v. *Florida,* 385 U. S. 39, 50–51 (1966) (DOUGLAS, J., dissenting).

[28] Brief for American Broadcasting Companies, Inc. 52.

[29] Brief for Columbia Broadcasting System, Inc. 34.

[30] *Id.,* at 40.

[31] Brief for National Broadcasting Company, Inc. 10.

[32] Brief for Post-Newsweek Stations, Capital Area, Inc. 31.

[33] *Tinker* v. *Des Moines Independent School District,* 393 U. S. 503, 512 (1969).

conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." [34]  Thus, in a related context, we have explicitly recognized that editorial advertisements constitute "an important outlet for the promulgation of information and ideas by persons who do not themselves have access to [media] facilities," and the unavailability of such editorial advertising can serve only "to shackle the First Amendment in its attempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources.' " *New York Times Co.* v. *Sullivan,* 376 U. S., at 266.

The Fairness Doctrine's requirement of full and fair coverage of controversial issues is, beyond doubt, a commendable and, indeed, essential tool for effective regulation of the broadcast industry.  But, standing alone, it simply cannot eliminate the need for a further, complementary airing of controversial views through the limited availability of editorial advertising.  Indeed, the availability of at least *some* opportunity for editorial advertising is imperative if we are ever to attain the " 'free and general discussion of public matters [that] seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.' "  *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936).

## III

Moreover, a proper balancing of the competing First Amendment interests at stake in this controversy must consider, not only the interests of broadcasters and of the listening and viewing public, but also the independent First Amendment interest of groups and individuals in effective self-expression.  See, *e. g.,* T. Emerson, Toward

[34] *United States* v. *Associated Press,* 52 F. Supp. 362, 372 (SDNY 1943), aff'd, 326 U. S. 1 (1945).  See also *Thomas* v. *Collins,* 323 U. S. 516, 545 (1945) (Jackson, J., concurring).

a General Theory of the First Amendment 4-7 (1966); Z. Chafee, Free Speech in the United States 33 (1941). "[S]peech concerning public affairs . . . is the essence of self-government," *Garrison* v. *Louisiana,* 379 U. S. 64, 74-75 (1964), and the First Amendment must therefore safeguard not only the right of the public to *hear* debate, but also the right of individuals to *participate* in that debate and to attempt to persuade others to their points of view. See, *e. g., Thomas* v. *Collins,* 323 U. S. 516, 537 (1945); cf. *NAACP* v. *Button,* 371 U. S. 415, 429-430 (1963). And, in a time of apparently growing anonymity of the individual in our society, it is imperative that we take special care to preserve the vital First Amendment interest in assuring "self-fulfillment [of expression] for each individual." *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972). For our citizens may now find greater than ever the need to express their own views directly to the public, rather than through a governmentally appointed surrogate, if they are to feel that they can achieve at least some measure of control over their own destinies.

In light of these considerations, the Court would concede, I assume, that our citizens have at least an abstract right to express their views on controversial issues of public importance. But freedom of speech does not exist in the abstract. On the contrary, the right to speak can flourish only if it is allowed to operate in an effective forum—whether it be a public park, a schoolroom, a town meeting hall, a soapbox, or a radio and television frequency. For in the absence of an effective means of communication, the right to speak would ring hollow indeed. And, in recognition of these principles, we have consistently held that the First Amendment embodies, not only the abstract right to be free from censorship, but also the right of an individual to utilize an appropriate and effective medium for the expression of his views.

See, *e. g., Lloyd Corp., Ltd.* v. *Tanner,* 407 U. S. 551, 559 (1972); *Tinker* v. *Des Moines Independent School District,* 393 U. S. 503 (1969); *Amalgamated Food Employees Union* v. *Logan Valley Plaza,* 391 U. S. 308 (1968); *Brown* v. *Louisiana,* 383 U. S. 131 (1966); *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Kunz* v. *New York,* 340 U. S. 290 (1951); *Marsh* v. *Alabama,* 326 U. S. 501 (1946); *Jamison* v. *Texas,* 318 U. S. 413 (1943); *Schneider* v. *State,* 308 U. S. 147 (1939); *Hague* v. *CIO,* 307 U. S. 496 (1939).

Here, of course, there can be no doubt that the broadcast frequencies allotted to the various radio and television licensees constitute appropriate "forums" for the discussion of controversial issues of public importance.[35]

---

[35] The Court does make the rather novel suggestion, however, that editorial advertising might indeed be "inappropriate" because "listeners and viewers constitute a 'captive audience.' " *Ante,* at 127. In support of this proposition, the Court cites our decisions in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451 (1952), and *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). In *Pollak,* however, we explicitly *rejected* a claim that the broadcasting of radio programs in streetcars violated the First and Fifth Amendment rights of passengers who did not wish to listen to those programs. And in *Kovacs,* although we upheld an ordinance forbidding the use on public streets of sound trucks which emit "loud and raucous noises," we did so because the ordinance was concerned, not with the *content* of speech, but, rather, with the offensiveness of the sounds themselves. Here, however, the Court seems perfectly willing to allow broadcasters to continue to invade the "privacy" of the home through commercial advertising and even controversial programming under the Fairness Doctrine. Thus, the Court draws its line solely on the basis of the content of the particular speech involved and, of course, we have consistently held that, where content is at issue, constitutionally protected speech may not be prohibited because of a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker* v. *Des Moines Independent School District,* 393 U. S., at 509; see, *e. g., Grayned* v. *City of Rockford,* 408 U. S. 104, 117 (1972). The suggestion that constitutionally protected speech may be banned because some per-

Indeed, unlike the streets, parks, public libraries, and other "forums" that we have held to be appropriate for the exercise of First Amendment rights, the broadcast media are dedicated *specifically* to communication. And, since the expression of ideas—whether political, commercial, musical, or otherwise—is the exclusive purpose of the broadcast spectrum, it seems clear that the adoption of a limited scheme of editorial advertising would in no sense divert that spectrum from its intended use. Cf. *Lloyd Corp., Ltd.* v. *Tanner, supra,* at 563; *Amalgamated Food Employees Union* v. *Logan Valley Plaza, supra,* at 320.

Moreover, it is equally clear that, with the assistance of the Federal Government, the broadcast industry has become what is potentially the most efficient and effective "marketplace of ideas" ever devised.[36] Indeed, the electronic media are today "the public's prime source of information," [37] and we have ourselves recognized that broadcast "technology . . . supplants atomized, relatively

sons may find the ideas expressed offensive is, in itself, offensive to the very meaning of the First Amendment.

[36] Indeed, approximately 95% of American homes contain at least one television set, and that set is turned on for an average of more than five and one-half hours per day. See Hearings on H. R. 13721 before the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., 7 (1970) (statement of Dean Burch, Chairman of the Federal Communications Commission). As to the potential influence of the electronic media on American thought, see generally A. Krock, The Consent of the Governed 66 (1971); H. Mendelsohn & I. Crespi, Polls, Television, and the New Politics 256, 264 (1970); Malone, 5 U. Mich. J. L. Reform, at 197.

[37] H. R. Rep. No. 91–257, p. 6 (1969). According to one study, 67% of Americans prefer the electronic media to other sources of information. See G. Wyckoff, The Image Candidates 13–14 (1968). See also Amendment of Sections 73.35, 73.240, and 73.636 of the Commission's Rules, 22 F. C. C. 2d 339, 344 (1970) (59% of Americans depend on television as their principal source of news).

informal communication with mass media as a prime source of national cohesion and news . . . ." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S., at 386 n. 15. Thus, although "full and free discussion" of ideas may have been a reality in the heyday of political pamphleteering, modern technological developments in the field of communications have made the soapbox orator and the leafleteer virtually obsolete. And, in light of the current dominance of the electronic media as the most effective means of reaching the public, any policy that *absolutely* denies citizens access to the airwaves necessarily renders even the concept of "full and free discussion" practically meaningless.

Regrettably, it is precisely such a policy that the Court upholds today. And, since effectuation of the individual's right to speak through a limited scheme of editorial advertising can serve only to further, rather than to inhibit, the public's interest in receiving suitable exposure to "uninhibited, robust, and wide-open" debate on controversial issues, the challenged ban can be upheld only if it is determined that such editorial advertising would unjustifiably impair the broadcaster's assertedly overriding interest in exercising *absolute* control over "his" frequency.[38] Such an analysis, however, hardly reflects the delicate balancing of interests that this sensitive question demands. Indeed, this "absolutist" approach wholly disregards the competing First Amendment rights of all "non-broadcaster" citizens, ignores the

---

[38] It should be noted that, although the Fairness Doctrine is at least arguably relevant to the *public's* interest in receiving suitable exposure to "uninhibited, robust, and wide-open" debate on controversial issues, it is not in any sense relevant to the *individual's* interest in obtaining access to the airwaves for the purpose of effective self-expression. For the individual's interest in expressing his own views in a manner of his own choosing is an inherently personal one, and it can never be satisfied by the expression of "similar" views by a surrogate spokesman.

teachings of our recent decision in *Red Lion Broadcasting Co.* v. *FCC, supra,* and is not supported by the historical purposes underlying broadcast regulation in this Nation.

Prior to 1927, it must be remembered, it was clearly recognized that the broadcast spectrum was part of the public domain. As a result, the allocation of frequencies was left entirely to the private sector,[39] and groups and individuals therefore had the same right of access to radio facilities as they had, and still have, to the printed press—that is, "anyone who will may transmit." [40] Under this scheme, however, the number of broadcasters increased so dramatically that by 1927 every frequency was occupied by at least one station, and many were occupied by several. "The result was confusion and chaos. With everybody on the air, nobody could be heard." *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 212 (1943). It soon became "apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government." *Red Lion Broadcasting Co.* v. *FCC, supra,* at 376. Thus, in the Radio Act of 1927, 44 Stat. 1162, Congress placed the broadcast spectrum under federal regulation and sought to reconcile competing uses of the airwaves by setting aside a limited number of frequencies for each of the important uses of radio.[41] And, since the number of frequencies allocated to public broadcasting was necessarily limited, the

[39] Indeed, pre-1927 regulation of radio gave no discretion to the Federal Government to deny the right to operate a broadcast station. See 1 A. Socolow, The Law of Radio Broadcasting 38 (1939); H. Warner, Radio & Television Law 757 *et seq.* (1948); see generally *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 210–214 (1943).

[40] 67 Cong. Rec. 5479 (Rep. White).

[41] These include, of course, not only public broadcasting, but also "amateur operation, aircraft, police, defense, and navigation . . . ." *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S., at 388.

Government was compelled to grant licenses to some applicants while denying them to others. See generally *Red Lion Broadcasting Co.* v. *FCC, supra,* at 375–377, 388; *National Broadcasting Co.* v. *United States, supra,* at 210–214.

Although the overriding need to avoid overcrowding of the airwaves clearly justifies the imposition of a ceiling on the number of individuals who will be permitted to operate broadcast stations [42] and, indeed, renders it "idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish," [43] it does not in any sense dictate that the continuing First Amendment rights of all nonlicensees be brushed aside entirely. Under the existing system, broadcast licensees are granted a preferred status with respect to the airwaves, not because they have competed successfully in the free market but, rather, "because of their initial government selection . . . ." *Red Lion Broadcasting Co.* v. *FCC, supra,* at 400. And, in return for that "preferred status," licensees must respect the competing First Amendment

---

[42] Although this licensing scheme necessarily restricts the First Amendment rights of those groups or individuals who are denied the "right" to operate a broadcast station, it does not, in and of itself, violate the First Amendment. For it has long been recognized that when "[c]onflicting demands on the same [forum] . . . compel the [Government] to make choices among potential users and uses," neutral rules of allocation to govern that scarce communications resource are not *per se* unconstitutional. *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 98 (1972); cf. *Cox* v. *Louisiana,* 379 U. S. 536, 554 (1965); *Cox* v. *New Hampshire,* 312 U. S. 569, 574 (1941); *Schneider* v. *State,* 308 U. S. 147, 160 (1939). And, in the context of broadcasting, it would be ironic indeed "if the First Amendment, aimed at protecting and furthering communications, prevented the Government from making radio communication possible . . . by limiting the number of licenses so as not to overcrowd the spectrum." *Red Lion Broadcasting Co.* v. *FCC, supra,* at 389.

[43] *Id.,* at 388.

rights of others. Thus, although the broadcaster has a clear First Amendment right to be free from Government censorship in the expression of his own views [44] and, indeed, has a significant interest in exercising reasonable journalistic control over the use of his facilities, "[t]*he right of free speech of a broadcaster . . . does not embrace a right to snuff out the free speech of others.*" *Id.*, at 387 (emphasis added). Indeed, after careful consideration of the nature of broadcast regulation in this country, we have specifically declared that

> "as far as the First Amendment is concerned those who are licensed stand no better than those to whom licenses are refused. A license permits broadcasting, but the licensee has no constitutional right to . . . monopolize a radio frequency to the exclusion of his fellow citizens." *Id.*, at 389.

Because I believe this view is as sound today as when voiced only four years ago, I can only conclude that there is simply no overriding First Amendment interest of broadcasters that can justify the *absolute* exclusion of virtually all of our citizens from the most effective "marketplace of ideas" ever devised.

This is not to say, of course, that broadcasters have *no* First Amendment interest in exercising journalistic supervision over the use of their facilities. On the contrary, such an interest does indeed exist, and it is an interest that must be weighed heavily in any legitimate effort to balance the competing First Amendment interests involved in this case. In striking such a balance, however, it must be emphasized that these cases deal *only* with the allocation of *advertising* time—air time that broadcasters regularly relinquish to others without the retention of significant editorial control. Thus, we are concerned here, not with the speech of broadcasters them-

---

[44] See, *e. g.*, 47 U. S. C. § 326.

selves,[45] but, rather, with their "right" to decide which *other* individuals will be given an opportunity to speak in a forum that has already been opened to the public.

Viewed in this context, the *absolute* ban on editorial advertising seems particularly offensive because, although broadcasters refuse to sell any air time whatever to groups or individuals wishing to speak out on controversial issues of public importance, they make such air time readily available to those "commercial" advertisers who seek to peddle their goods and services to the public. Thus, as the system now operates, any person wishing to market a particular brand of beer, soap, toothpaste, or deodorant has direct, personal, and instantaneous access to the electronic media. He can present his own message, in his own words, in any format he selects, and at a time of his own choosing. Yet a similar individual seeking to discuss war, peace, pollution, or the suffering of the poor is denied this right to speak. Instead, he is compelled to rely on the beneficence of a corporate "trustee" appointed by the Government to argue his case for him.

It has long been recognized, however, that although access to public forums may be subjected to reasonable "time, place, and manner" regulations,[46] "[s]elective exclusions from a public forum may not be based on *content* alone . . . ." *Police Dept. of Chicago* v. *Mosley,* 408 U. S., at 96 (emphasis added); see, *e. g., Shuttlesworth* v. *City of Birmingham,* 394 U. S. 147 (1969);

---

[45] Thus, as the Court of Appeals recognized, "[i]n normal programming time, closely controlled and edited by broadcasters, the constellation of constitutional interests would be substantially different." 146 U. S. App. D. C., at 193, 450 F. 2d, at 654.

[46] See, *e. g., Police Dept. of Chicago* v. *Mosley, supra,* at 98; *Grayned* v. *City of Rockford,* 408 U. S., at 115; *Cox* v. *Louisiana, supra,* at 554; *Poulos* v. *New Hampshire,* 345 U. S. 395, 398 (1953); *Cox* v. *New Hampshire, supra,* at 575–576; *Schneider* v. *State, supra,* at 160.

*Edwards* v. *South Carolina,* 372 U. S. 229 (1963) ; *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953) ; *Niemotko* v. *Maryland,* 340 U. S. 268 (1951) ; *Saia* v. *New York,* 334 U. S. 558 (1948). Here, of course, the differential treatment accorded "commercial" and "controversial" speech clearly violates that principle.[47]  Moreover, and not without some irony, the favored treatment given "commercial" speech under the existing scheme clearly reverses traditional First Amendment priorities. For it has generally been understood that "commercial" speech enjoys *less* First Amendment protection than speech directed at the discussion of controversial issues of public importance. See, *e. g., Breard* v. *Alexandria,* 341 U. S. 622 (1951) ; *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942).

The First Amendment values of individual self-fulfillment through expression and individual participation in public debate are central to our concept of liberty. If these values are to survive in the age of technology, it is essential that individuals be permitted at least *some* opportunity to express their views on public issues over the electronic media. Balancing those interests against the limited interest of broadcasters in exercising "journalistic supervision" over the mere allocation of *advertising* time that is already made available to some members of the public, I simply cannot conclude that the interest of broadcasters must prevail.

## IV

Finally, the Court raises the specter of administrative apocalypse as justification for its decision today. The Court's fears derive largely from the assumption, implicit

---

[47] Contrary to the Court's assertion, the existence of the Fairness Doctrine cannot in any sense rationalize this discrimination. Indeed, the Fairness Doctrine is wholly unresponsive to the need for individual access to the airwaves for the purpose of effective self-expression. See also n. 38, *supra.*

in its analysis, that the Court of Appeals mandated an *absolute* right of access to the airwaves  In reality, however, the issue in these cases is not whether there is an *absolute* right of access but, rather, whether there may be an *absolute denial* of such access. The difference is, of course, crucial, and the Court's misconception of the issue seriously distorts its evaluation of the administrative difficulties that an invalidation of the absolute ban might conceivably entail.

Specifically, the Court hypothesizes three potential sources of difficulty: (1) the availability of editorial advertising might, in the absence of adjustments in the system, tend to favor the wealthy; (2) application of the Fairness Doctrine to editorial advertising might adversely affect the operation of that doctrine; and (3) regulation of editorial advertising might lead to an enlargement of Government control over the content of broadcast discussion. These are, of course, legitimate and, indeed, important concerns. But, at the present time, they are concerns—not realities. We simply have no sure way of knowing whether, and to what extent, if any, these potential difficulties will actually materialize. The Court's bare assumption that these hypothetical problems are both inevitable and insurmountable indicates an utter lack of confidence in the ability of the Commission and licensees to adjust to the changing conditions of a dynamic medium. This sudden lack of confidence is, of course, strikingly inconsistent with the general propositions underlying all other aspects of the Court's approach to this case.

Moreover, it is noteworthy that, 28 years ago, the Commission itself declared that

"the operation of any station under the extreme principles that no time shall be sold for the dis-

cussion of controversial public issues . . . is inconsistent with the concept of public interest. . . . The Commission recognizes that good program balance may not permit the sale or donation of time to all who may seek it for such purposes and that difficult problems calling for careful judgment on the part of station management may be involved in deciding among applicants for time when all cannot be accommodated. However, competent management should be able to meet such problems in the public interest and with fairness to all concerned. The fact that it places an arduous task on management should not be made a reason for evading the issue by a strict rule against the sale of time for any programs of the type mentioned." *United Broadcasting Co.,* 10 F. C. C. 515, 518 (1945).

I can see no reason why the Commission and licensees should be deemed any less competent today then they were in 1945. And even if intervening developments have increased the complexities involved in implementing a limited right of access, there is certainly no dearth of proposed solutions to the potential difficulties feared by the Court. See, *e. g.,* Canby, The First Amendment Right to Persuade: Access to Radio and Television, 19 U. C. L. A. L. Rev. 723, 754–757 (1972); Malone, Broadcasting, the Reluctant Dragon: Will the First Amendment Right of Access End the Suppressing of Controversial Ideas?, 5 U. Mich. J. L. Reform 193, 252–269 (1972); Johnson & Westen, A Twentieth-Century Soapbox: The Right to Purchase Radio and Television Time, 57 Va. L. Rev. 574 (1971); Note, 85 Harv. L. Rev. 689, 693–699 (1972).

With these considerations in mind, the Court of Appeals confined itself to invalidating the flat ban alone,

leaving broad latitude [48] to the Commission and licensees to develop in the first instance reasonable regulations to govern the availability of editorial advertising. In the context of these cases, this was surely the wisest course to follow, for "if experience with the administration of these doctrines indicates that they have the net effect of reducing rather than enhancing [First Amendment values], there will be time enough to reconsider the constitutional implications." *Red Lion Broadcasting Co. v. FCC,* 395 U. S., at 393.

For the present, however, and until such time, if ever, as these assertedly "overriding" administrative difficulties actually materialize, I must agree with the conclusion of the Court of Appeals that although "it may unsettle some of us to see an antiwar message or a political party message in the accustomed place of a soap or beer commercial . . . we must not equate what is habitual with what is right—or what is constitutional. A society already so saturated with commercialism can well afford another outlet for speech on public issues. All that we may lose is some of our apathy." [49]

---

[48] The Court of Appeals did, however, suggest certain possible contours of implementation. For example, the court noted that broadcasters should be permitted "to place an outside limit on the total amount of editorial advertising they will sell," and " 'reasonable regulation' of the placement of advertisements is altogether proper." 146 U. S. App. D. C., at 202, 450 F. 2d, at 663.

[49] *Id.,* at 204–205, 450 F. 2d, at 665–666.